**David FRANKSON, Respondent,**

v.

**DESIGN SPACE INTERNATIONAL, et al., Appellants.**

**No. C5-85-708.**

Supreme Court of Minnesota.

Oct. 10, 1986.

Allen I. Saeks, James V. Roth, Minneapolis, for appellants.

Christopher S. Hayhae, Paul C. Wolf, Edina, for respondent.

SCOTT, Justice.

David Frankson ("Frankson") commenced this action in Hennepin County District Court, claiming that Design Space International ("DSI"), a division of Transport International Pool, Inc., had breached his employment commission contract; that DSI owed him compensation for the reasonable value of his services; that DSI had mali-

ciously and wrongfully terminated his employment; and that his termination was done in a willful, malicious, defamatory, and outrageous manner. DSI counterclaimed, alleging that Frankson had breached both a covenant not to compete and a covenant not to divulge trade secrets and that he had engaged in unfair competition and deceptive trade practices following his termination.

The trial court denied defendants' motion for a directed verdict, both at the close of the plaintiff's case and at the close of all evidence, but granted plaintiff's motion for a directed verdict on the counterclaims. The jury awarded Frankson $28,196.27 plus interest for the reasonable value of his services, $70,000 in compensatory damages for defamation, and $125,000 in punitive damages. The trial court denied DSI's motion for judgment notwithstanding the verdict or for a new trial, and DSI appealed. The court of appeals, en banc, affirmed the trial court's decision, 380 N.W.2d 560. We affirm in part and reverse in part.

Frankson was employed by DSI, a division of Transport International Pool, Inc., and its predecessor, Space Rentals, from November, 1974, to November 24, 1980. DSI is in the business of selling and leasing mobile offices and other modular structures. Frankson began as DSI's Minneapolis branch sales manager and, at the time of his termination, was a major projects manager. Frankson's employment was governed by a series of written contracts. DSI's policy was to execute a new employment agreement whenever there was a change in title, salary, or territory.

In February, 1980, Frankson became a major projects sales representative with responsibility for major projects, which included those involving (1) more than $100,000 in building costs; (2) customers leasing more than 25 units per year; (3) the federal government; or (4) exports. He also retained the title of branch sales manager. He executed an employment agreement covering both of these positions in February, 1980.

Under the terms of his employment agreements Frankson was to receive a salary and "other valuable considerations." One of these valuable considerations was a commission or bonus, which was calculated according to the DSI compensation plan then in effect. The following clause appeared in the 1977–78 compensation plan: "The maximum cumulative commission payable for one or more contracts with one customer during the fiscal year shall not exceed $5,000." The 1978–79 and 1979–80 plans contained similar limitations. In 1980–81, DSI issued a new compensation plan specifically applicable to those in the major projects program. While still limiting commissions, that plan raised the limit to $10,000 per project.

Frankson was unhappy with these commission limits. When he signed the 1979–80 plan in September, 1979, he inserted: "With one exception that you waive the maximum cumulative commission payable for one or more contracts with one customer during the fiscal year" and a line for DSI's president, Ray Wooldridge ("Wooldridge"), to sign. Frankson sent the compensation plan with these modifications to Wooldridge, who did not sign it.

Frankson testified that he inserted this exception because he was going into the major projects program. He further testified that William Lindelow ("Lindelow"), DSI's vice-president of sales and the major projects program's supervisor, told him there would be no commission limitation for those in major projects. No special compensation plan specifically applicable to major projects salespeople was effective until August 1, 1980, although a draft that contained no commission limitation was sent to Frankson and other major projects salespeople in May, 1980. They were told that the plan was incomplete and were instructed to return it unsigned. Lindelow also testified that before August 1, 1980, there was only one compensation plan, the one with the $5,000 commission limitation, but that DSI had individual agreements with its original major projects salespeople, Maurice Phillips and Robert Holt ("Holt"). Holt testified that his oral agreement with

Wooldridge and Lindelow provided for a salary plus 2% of sales between $550,000 and $1,500,000 and 1% of everything over $1,500,000. Holt operated under this agreement until the major projects program was expanded and the major projects compensation plan with its commission limitation came into effect.

Between February 1, 1980, and July 31, 1980, Frankson made sales to Montana Power totaling $2,319,627.16. These sales were invoiced between March and August of 1980, when there was no written compensation plan specifically applicable to major projects. While DSI claimed that the $5,000 limitation of the general compensation plan applied, Frankson claimed that there should be no limitation because of Lindelow's representations. Frankson admitted, however, that Lindelow had told him that any major projects compensation plan would have to be approved by Wooldridge.

When the dispute over his commissions arose, Lindelow advised Frankson to prepare a memorandum showing his sales to Montana Power and the commissions he thought he should receive. Frankson sent the figure of $28,196.27 to Lindelow in late August, 1980. Lindelow wrote "OK to pay" on it, signed it, and forwarded it to Wooldridge. The DSI compensation committee then discussed this dispute and agreed to pay Frankson $10,000, the amount of the commission limit under the new compensation plan. Frankson did not cash the check for $10,000 that DSI tendered to him.

In early November, 1980, Wooldridge, Lindelow, and Edward Burns ("Burns"), DSI's director of personnel, attended a meeting at which they decided to terminate Frankson. Both Lindelow and Burns testified that Frankson's commission dispute was not discussed at this meeting, and Burns further testified that he thought the dispute was settled when he sent the $10,000 check to Frankson. About a week later, on November 17, 1980, Lindelow and Burns went to Frankson's office and gave him a letter terminating his employment with DSI effective November 24, 1980. The letter recited the reason for Frankson's termination as his "failure to increase business as a major projects representative."

At trial, Frankson presented evidence of his past sales achievements and of the sales projects he had worked on in 1980. Lindelow testified, however, that Frankson had no sales in the quarter prior to his termination, while other major projects salespeople had made sales during this period.

After his termination, Frankson went into business for himself instead of looking for another sales job. He used his savings of $5,000 for capital and ran the business from his home. This business, called Space Mobile and Modular Structures, like DSI sold and leased modular structures.

Frankson then brought this action. The jury found no breach of contract but awarded Frankson $28,196.27 plus interest as the reasonable value of his services. The jury found that Frankson's employment was at will and that he was not wrongfully terminated, but awarded him $70,000 in compensatory damages and $125,000 in punitive damages after finding that the statement in his termination letter—that he was terminated for failing to increase sales—was both untrue and made with actual malice.

The issues needed for resolution of this case can be stated as follows:

(1) Was DSI's statement published?

(2) Was there sufficient evidence of malice to overcome the qualified privilege, allowing the consideration of the compensatory and punitive damage issues?

(3) Did the trial court err in submitting the issue of quantum meruit to the jury?

1. In order for a statement to be defamatory it "must be communicated to someone other than the plaintiff, it must be false, and it must tend to harm the plaintiff's reputation and to lower him in the estimation of the community." *Stuempges v. Parke, Davis & Co.*, 297 N.W.2d 252, 255 (Minn.1980). DSI argues that the first element, communication to someone other

than the plaintiff or publication, is not satisfied when the corporate personnel director prepares a termination letter that is shown only to the terminated employee, his immediate supervisor, and the corporation's president. Frankson, on the other hand, argues that this type of in-house communication is publication.

This court has not squarely addressed this issue. In *Hebner v. Great Northern Railway Co.*, 78 Minn. 289, 80 N.W. 1128 (1899), however, this court went on to consider qualified privilege, an affirmative defense, and actual malice, which destroys that defense, when "the only publication complained of was when the record [of the reason for plaintiff's termination] was communicated by one of the clerks employed by defendant * * * to another clerk; both being interested, and both acting strictly within the line of duty." *Id.* at 292, 80 N.W. at 1129. This case suggests that communication between two corporate employees, both with a need to know, is sufficient publication to support a defamation action. *See also McBride v. Sears, Roebuck & Co.*, 306 Minn. 93, 99, 235 N.W.2d 371, 375 (1975) (communication of suspicions to employees investigating misconduct was not actionable because "any publication to any of them was privileged").

Other jurisdictions are divided on this issue. Some treat intra-corporate communications as communication to third parties fulfilling the publication requirement for defamation. *See, e.g., Luttrell v. United Telephone System, Inc.*, 236 Kan. 710, 711, 695 P.2d 1279, 1279 (1985) (interoffice communications between supervisory personnel "constitute publications to a third person sufficient for a defamation action"); *Rickbeil v. Grafton Deaconess Hospital*, 74 N.D. 525, 542, 23 N.W.2d 247, 256 (1946) (dictation to stenographer and her transcription of her notes "constitutes publication within the purview of the law of libel"). Other jurisdictions treat communications between agents of a corporation as a communication with the corporation itself and hold that there is no publication because there is no communication to a third person. *See, e.g., Ellis v. Jewish Hospital,*

581 S.W.2d 850, 851 (Mo.Ct.App.1979) (no actionable publication when contents of personnel files are communicated to supervisory personnel); *Prins v. Holland-North America Mortgage Co.*, 107 Wash. 206, 208, 181 P. 680, 680–81 (1919) (communication between agents of the same corporation in the regular course of business "cannot be a publication of the libel on the part of the corporation").

Still other courts appear to confuse the issue of publication with that of privilege. *See, e.g., Ranous v. Hughes*, 30 Wis.2d 452, 462, 141 N.W.2d 251, 255–56 (1966) ("whether there was the requisite element of publication by defendant turns on whether * * * [the communication] was privileged"); *see also Hoff v. Pure Oil Co.*, 147 Minn. 195, 199, 179 N.W. 891, 892 (1920) (the communication "is privileged, and is not a publication of any libel").

Both the Restatement (Second) of Torts and Professor Keeton agree that the first position, treating intra-corporate communications as publications that may be qualifiedly privileged, is the better view. *See* Restatement (Second) of Torts § 577 comment h (1977); W. Keeton, D. Dobbs, R. Keeton & D. Owens, *Prosser and Keeton on the Law of Torts* § 113 (5th ed.1984). Professor Keeton writes:

> There may be publication to any third person. It may be made to * * * the defendant's own agent, employee or officer, even where the defendant is a corporation. The dictation of defamatory matter to a stenographer generally is regarded as sufficient publication, although it may be privileged.

*Id.* § 113, at 798–99 (footnotes omitted) (citing, *inter alia, Pullman v. Walter Hill & Co.*, 1 Q.B. 524, 50 L.J.Q.B. 209 (1891); *Rickbeil v. Grafton Deaconess Hospital*, 74 N.D. 525, 23 N.W.2d 247 (1946); *Ostrowe v. Lee*, 256 N.Y. 36, 175 N.E. 505 (1931); *Arvey Corp. v. Peterson*, 178 F.Supp. 132 (E.D.Pa.1959); *Gambrill v. Schooley*, 93 Md. 48, 48 A. 730 (1901); *Berry v. City of New York Ins. Co.*, 210 Ala. 369, 98 So. 290 (1923)). The court in

the *Rickbeil* case, *supra,* in which the only publication was dictation to a stenographer, stated the rule succinctly:

> Publication of defamatory matter is the communication of the same to a third person. * * * The action may be maintained even if published to one person only. * * * To publish is to intentionally exhibit the defamatory words to one other than the libelee. No words more definitely convey the idea requisite in law to support an action for writing defamatory words.

*Rickbeil,* 74 N.D. at 533, 23 N.W.2d at 251.

The jury found that the statements in Frankson's termination letter were qualifiedly privileged. This is not inconsistent with *Lewis v. Equitable Life Assurance Society of the United States,* 389 N.W.2d 876 (Minn.1986), in which this court concluded "that an employer's communication to an employee of the reason for discharge may present a proper occasion upon which to recognize a qualified privilege." *Id.* at 890.

■ We therefore hold that preparation of the defamatory letter and distribution of that letter to a personnel file and to two officers, Lindelow and Wooldridge, constituted publication sufficient for a defamation action.

2. In holding that the statements in Frankson's termination letter were qualifiedly privileged, "[a]ctual malice must be proved, before there can be a recovery, and in the absence of such proof the plaintiff cannot recover." *Stuempges v. Parke, Davis & Co.,* 297 N.W.2d 252, 257 (Minn.1980) (quoting *Hebner v. Great Northern Railway,* 78 Minn. 289, 292, 80 N.W. 1128, 1129 (1899)). The plaintiff has the burden of proving actual malice, which is defined in Minnesota law as "actual ill will, or a design causelessly and wantonly to injure plaintiff." *McBride v. Sears, Roebuck & Co.,* 306 Minn. 93, 98, 235 N.W.2d 371, 375 (1975). Whether a qualified privilege has been lost through abuse, that is, by acting with actual malice, is a jury question. *See Lewis,* 389 N.W.2d at 890. In this case, the jury found that DSI's statements in Frank-

son's termination letter were made with actual malice.

The standard of review is limited for review of jury verdicts. A jury verdict will be set aside "only if it is 'manifestly and palpably contrary to the evidence.'" *Stuempges,* 297 N.W.2d at 256 (quoting *Carpenter v. Mattison,* 300 Minn. 273, 276, 219 N.W.2d 625, 629 (1974)). In *Froslee v. Lund's State Bank,* 131 Minn. 435, 155 N.W. 619 (1915), this court sustained a finding of malice when "[t]here was some evidence from which it might be inferred that the defendant knew of the falsity of some of the statements [and] * * * also some evidence of ill feeling between [defendant's employee] and plaintiff." *Id.* at 438, 155 N.W. at 620. "Malice may be proved by extrinsic evidence of personal ill feeling, or by intrinsic evidence such as the exaggerated language of the libel, the character of the language used, the mode and extent of publication, and other matters in excess of the privilege." *Friedell v. Blakely Printing Co.,* 163 Minn. 226, 231, 203 N.W. 974, 976 (1925) (citation omitted).

■ In this case, neither the language used, "failure to increase sales," nor the mode and extent of publication, communication to those involved in the decision-making process and deposit of a copy in Frankson's personnel file, allows the conclusion that the statement was malicious. Frankson instead argues that there was personal ill feeling arising out of his commission dispute with DSI. In *Hoff v. Pure Oil Co.,* 147 Minn. 195, 179 N.W. 891 (1920), this court reversed the trial court's order denying defendant's motion for judgment notwithstanding the verdict or for a new trial, concluding that there was no evidence of malice even though there was some evidence that defendant had given plaintiff a bad recommendation to retaliate for plaintiff's hiring away another employee.

Other jurisdictions have refused to find the malice necessary to destroy qualified privilege when the plaintiff only presented evidence of another possible reason for the

action taken. *See, e.g., Beauvoir v. Rush-Presbyterian-St. Luke's Medical Center*, 137 Ill.App.3d 294, 297, 92 Ill.Dec. 110, 113, 484 N.E.2d 841, 844 (1985) (bare assertion that real reason for discharge was retaliation for filing worker's compensation claims was not enough to get to jury on malice issue); *Murphy v. Johns-Manville Products Corp.*, 45 N.J.Super. 478, 495, 133 A.2d 34, 43, *cert. denied*, 25 N.J. 55, 134 A.2d 833 (1957) (although plaintiff claimed that discharge was really motivated by his rejection of settlement of compensation claim, "[t]here is not an iota of specific testimony which would directly justify the inference plaintiff seeks to have the court draw" and, therefore, there was no jury issue).

Here there was direct evidence that Frankson's termination was motivated by his sales record. Both Lindelow and Burns testified that the commission dispute was not discussed at the meeting at which they decided to terminate Frankson. Lindelow further testified that Frankson made no sales in his final quarter with DSI, August through October, 1980. Frankson presented no evidence that the commission dispute was discussed at the meeting at which the termination decision was made or of any sales he made during his final quarter with DSI.

It is obvious from the jury's findings that the appellants' evidence was not awarded much credibility. Even so, whatever the jury may have concluded in this case, the totality of evidence could not allow the finding of malice to remove the qualified privilege. Despite the gnawing frustration Frankson may feel because a false reason for his discharge exists in his personnel file, the matter of defamation in total should not have been submitted to the jury. The evidence was insufficient for a finding of malice.

■ 3. The only remaining relevant issue is whether the plaintiff should recover in quantum meruit. DSI argues that recovery in quantum meruit is inappropriate because Frankson was making claims predicated on an express contract. *See*

*United States Fire Insurance Co. v. Minnesota State Zoological Board*, 307 N.W.2d 490, 497 (Minn.1981) ("equitable relief cannot be granted where the rights of the parties are governed by a valid contract"). Frankson, however, should recover. While the jury's answers to special verdict questions suggest that they found a valid modification of the employment agreement, the question dealing with breach refers only to the February, 1980, agreement and the jury found that that agreement was not breached and instead awarded Frankson the reasonable value of his services. There was not a full agreement concerning compensation between Frankson and DSI, and there was, needless to say, much confusion concerning details of the compensation arrangements. For these reasons Frankson should recover the reasonable value of his services in quantum meruit, *see Ritchel v. Remington*, 155 Minn. 154, 156, 193 N.W. 32, 33 (1923); *McKee v. Vincent*, 33 Minn. 508, 508–09, 24 N.W. 253, 253 (1885).

We affirm Frankson's recovery of $28,196.27 plus interest on quantum meruit. We reverse the awards of both compensatory and punitive damages because the evidence was insufficient to sustain the jury's finding of malice overcoming DSI's qualified privilege. This holding makes any other evidentiary issue raised irrelevant.

Affirmed in part and reversed in part.

SIMONETT, J., took no part in the consideration or decision of this case.