Robert L. BARI, Appellant,

v.

CONTROL DATA CORPORATION, Respondent.

No. C4–88–1783.

Court of Appeals of Minnesota.

May 2, 1989.

Review Denied July 12, 1989.

William J. Mavity, James G. Ryan, Mavity & Ryan, Minneapolis, for appellant.

Barbara A. Leininger, Bloomington, for respondent.

Heard, considered and decided by LANSING, P.J., and FOLEY and SCHUMACHER, JJ.

## OPINION

FOLEY, Judge.

Appellant Robert L. Bari brought suit against respondent Control Data Corporation for breach of employment contract and discrimination on the basis of age and disability and failure to make reasonable accommodation under Minn.Stat. § 363.03 (1986). The contract claim was tried to the jury and the discrimination claims were tried to the court. Judgment was entered for Control Data on all claims. Bari appeals from the order denying his motion for new trial. We affirm.

## FACTS

Bari, age 53 at the time of trial, was employed by Control Data from 1968 to 1985, when his employment was terminated. His last position with Control Data was that of District Manager for Engineering Services in the Eastern Region (New York). Bari was considered an exempt employee.

Bari had his first heart attack in 1975 at age 40. This attack was followed by other attacks in 1976, 1979, and 1982. After recovering from the 1982 attack, Bari requested and received a transfer to a less stressful position. In February 1983 he was transferred to his last position.

Several months later Bari experienced a recurrence of his heart problems. He relocated to Minneapolis to be closer to his doctors and eventually took a disability leave of absence in November 1983.

The parties stipulated that the "Control Data Corporation Approved Policy and Procedure on Sick Leave and Disability Programs" constituted part of Bari's employment contract. This policy establishes the procedures the company is to follow once a disabled employee is released by his physician to return to work. The policy "guarantees every employee returning from a period of disability a job offer after an appropriate medical release to resume working." Employees released without any medical restrictions are to be placed on the payroll immediately. Those having restrictions "are to be returned to work as rapidly as practical, but definitely within 30 calendar days of the medical release date." It is the responsibility of management and personnel to "evaluate the employee's ability to perform the duties of a given occupation, with appropriate medical information."

If medical restrictions exist, disability benefits continue until either the employee returns to work or until thirty days from notice of a release to return to work, unless a deviation to the policy is approved. If the personnel manager believes that it will be "impossible" to place the employee within the 30 day period, "a deviation from policy must be requested." If no job is found and no deviation has been approved, the employee "must be placed, by the 31st day, on the payroll of the department which the employee left when the disability began."

The policy also contains an exception relevant to this case, which provides as follows:

> 9. After being released to return to work, the employee should be terminated or laid off if a workforce reduction occurred during the disability that would have affected the employee had the employee remained at work (see policy 6:15:66, Temporary Work Force Adjustments Nonexempt Employees).

That exception was later modified by Control Data to provide as follows:

> 9. After being released to return to work full-time, the employee should be terminated or laid off if a work force reduction occurred during the disability that would have affected the employee had the employee remained at work (See 6:15:66, Work Force Adjustments/Reductions).

The reference to nonexempt employees was removed in the amended version.

Carolyn Floyd, a personnel consultant at Control Data, testified that the original version did not apply to exempt employees. She further testified that the amended version would appear to cover all employees, including exempt employees.

In June 1985, Bari was formally released by his treating physicians to return to work, and he was informed by Control Data that his disability benefits would be terminated. Bari contacted Merodie Kosta, a consultant in Control Data's Disability Management Department, who advised him to meet with Floyd. At that meeting, Floyd gave Bari a formal notification letter stating that the company would attempt to locate a position for him within Engineering Services and that, if after 30 days no position had been found, he would be terminated "due to workforce reduction."

Floyd testified that it was her responsibility to identify an available position, evaluate whether or not Bari could perform that job given his medical restrictions, and place him in an acceptable position as guaranteed by the company. She testified that she spent a week and a half in June and some additional time in July 1985 attempting to find a position for Bari. Although an opportunity was discussed, she did not offer any positions to Bari; she did not tell him about any jobs she thought were suitable or look for a job outside of Engineering Services; she did not have a copy of his resume or medical report; and no deviation from policy was requested at the end of the 30 day placement period. Both Floyd and Kosta testified that Bari's case was handled strictly as a workforce reduction case and not as a return to work matter under the disability policy.

Floyd testified that Bari indicated to her he was not willing to look at a position two or three levels below his last job. He decided not to complete a three day job search seminar after attending the first day and a half.

Floyd further testified that on July 23, 1985, Bari called her to tell her that he had decided not to pursue placement within Control Data and that she should go ahead and process his termination. Bari testified that he did not ask Floyd to stop the internal placement efforts and that he never told Floyd he wanted to take the termination.

While Bari was on disability leave, a consolidation occurred in Engineering Services, in which the eastern and southeastern regions were combined. As a result, the number of district management positions was reduced. Floyd testified that Bari's position in the eastern region had changed and that he had been identified as an excess employee.

At the close of the testimony, the trial court ruled on the applicability of the workforce reduction paragraph to Bari.

The court will make a finding as a matter of law that the plaintiff is subject to paragraph 9 of Plaintiff's Exhibit 47 pursuant to the return to work procedure. That it is not intended by the caveat in that paragraph to exclude Mr. Bari from the return to work procedure by defining him as an exempt employee. That in fact the plaintiff is subject to the work force reduction that went into effect during the period of his disability. That in fact his New York City district under engineering services of Control Data was eliminated. And that as such, he was subject to the non-disability benefits of a work force reduced excess employee on the date of his formal return to work which the Court is concluding was July 2, 1987 when he received his notice.

In its special verdict, the jury determined that Control Data had not breached its contract of employment with Bari. The jury was also asked to render advisory findings on the discrimination claims. The jury found that Bari's disability was a discernible, causative factor in the decision to discharge him, but that Control Data did not fail to make reasonable accommodation to his disability. The trial court rejected the advisory findings and ruled in favor of Control Data on each of Bari's discrimination claims.

### ISSUE

Did the trial court err in determining as a matter of law that the workforce reduction exception in the disability policy applied to Bari?

### ANALYSIS

The decision to grant a new trial is vested in the discretion of the trial court, and the trial court's decision will be reversed

only for a clear abuse of that discretion. *City of Ogema v. Bevins*, 341 N.W.2d 298, 299 (Minn.Ct.App.1983). As grounds in his motion for new trial, Bari asserts that the trial court erred as a matter of law when it ruled that the workforce reduction exception of paragraph 9 applied to him.

The parties stipulated that the Policy and Procedure on Sick Leave and Disability Programs constituted part of Bari's employment contract. The general rule in construing contracts is that where the intention of the parties may be determined entirely from the writing, the construction of the contract is a question of law for the court. *Empire State Bank v. Devereaux*, 402 N.W.2d 584, 587 (Minn.Ct.App.1987). However, where the language is ambiguous, resort may be had to extrinsic evidence, and construction then becomes a question of fact for the jury, unless such evidence is conclusive. *Id.* A contract is ambiguous if it is susceptible to more than one meaning. *Clapp v. Haferman Water Conditioning, Inc.*, 380 N.W.2d 838, 842 (Minn.Ct.App.1986).

Bari contends that paragraph 9 was clearly ambiguous and susceptible to more than one interpretation and that extrinsic evidence was offered at trial to determine the meaning of that paragraph. Bari testified that during his tenure with the company, exempt employees had never been subject to workforce reductions. He also cites to the testimony of Floyd, who indicated that paragraph 9 did not apply to exempt employees. Bari argues that the construction of the contract therefore became a question for the fact finder, and that it was error to remove the issue from the jury.

Even if there is ambiguity here and the question should have been considered a question of fact, the issue has been rendered moot by the finding of the jury and its obvious reliance on the testimony of Floyd. Floyd's testimony supports the jury's determination that Control Data did not breach Bari's employment contract. Floyd testified that Bari asked her to proceed with his termination prior to the expiration of the 30 day employment search period. She also testified that Bari did not attend the entire job search seminar and did not want to consider a lesser position.

Bari argues that the findings in the special jury verdict are inconsistent, and that the jury's answer to the finding on disability would disprove the fact that he asked Floyd to process his termination. In its first finding, the jury answered that Control Data had not breached its contract of employment with Bari. In the third finding, the jury answered that Bari's disability was a discernible, causative factor in the decision to discharge him. In our view, the finding on his disability is not inconsistent with the evidence in this case, and we cannot view this finding in isolation. The jury had the opportunity to assess the credibility of the witnesses, and we conclude that the jury relied on Floyd's testimony. It is the unique function of the factfinder to assess witness credibility. *Tews v. Geo. A. Hormel & Co.*, 430 N.W.2d 178, 180 (Minn. 1988). A single credible witness can be relied upon to prove or disprove a material fact.

A new trial is required only where the alleged error of law results in prejudice to the plaintiff. *Danielson v. Hanford*, 352 N.W.2d 758, 762 (Minn.Ct.App.1984). Even if the question of the applicability of the workforce reduction exception should have been submitted to the jury, there is no reversible error here because the case could be decided on Floyd's testimony that Bari asked her to proceed with his termination. We find no prejudice to Bari and no abuse of discretion in the trial court's refusal to grant his motion for new trial. *See Berry v. Goetz*, 348 N.W.2d 376, 379 (Minn.Ct.App.1984).

As we find no abuse of discretion in the denial of the motion for new trial, we do not reach Bari's argument that the court's decision on the discrimination claims be vacated pending a new trial on the contract claim.

## DECISION

Affirmed.