**Diane GILMORE, Respondent,**

v.

**CONTROL DATA**
**CORPORATION, Appellant.**

**No. C7–88–2670.**

Court of Appeals of Minnesota.

July 25, 1989.

William J. Mavity, James G. Ryan, Mavity & Ryan, Minneapolis, for respondent.

Barbara A. Leininger, Bloomington, for appellant.

Heard, considered and decided by PARKER, P.J., and FOLEY and SHORT, JJ.

## OPINION

FOLEY, Judge.

Respondent Diane Gilmore brought action against her former employer, appellant Control Data Corporation, alleging breach of employment contract and disability discrimination. The jury found in favor of Gilmore on the contract claim and the court found in favor of Control Data on the discrimination claims. Control Data appeals from the judgment and from the order denying its motion for new trial. Gilmore seeks review of the court's determination on the discrimination claims. We affirm.

## FACTS

Gilmore, age 40, was employed by Control Data from 1976 through August 3, 1984, when her employment was terminated. She worked as an administrative technician in the Facilities Division, where her position involved coordinating responses to maintenance calls and preparing administrative reports.

In August 1979, Gilmore was injured in an automobile accident unrelated to her employment. She sustained a 15% permanent disability to her neck, shoulder and upper back as a result of that accident.

In 1982, Gilmore's treating physician, Dr. Michael Bromer, recommended that she take a leave of absence from work due to the worsening of her condition. Her request for leave was approved and she commenced the disability leave in November 1982.

Control Data's policy governing medical leaves of absence and disability benefits is set forth in a booklet entitled "Disability Income Protection." The company admits this booklet was given to its full time employees, including Gilmore. The booklet provides that "after an appropriate physician has signed a medical release," it is the company's obligation to offer the employee the highest grade job for which the employee is qualified and medically able to perform. In placing the employee in such a job, the company is also committed to making reasonable "job accommodations." If the employee is no longer considered disabled according to the definition of disability and does not accept a full-time job offer that is medically approved and meets the criteria for suitability, employment may be terminated.

Control Data retains Northwestern National Life Insurance Company (NWNL) to administer its long-term disability plan. NWNL is responsible for administering payment of benefits as well as assisting in the return to work process. Gilmore's return to work was to be overseen by Daniel Abramowski, then a senior rehabilitation coordinator for NWNL.

In April 1984, Gilmore contacted Dr. Bromer about returning to work. On April 9, 1984, Dr. Bromer provided NWNL with a report indicating that he would be seeing Gilmore in the near future and would be discussing her return to work. His report

indicated that her test results were normal. He indicated in letters to Gilmore that she could attempt to return to work part-time with some restrictions and that eventually she should be able to return to full-time work.

NWNL scheduled Gilmore for an examination by Dr. Walter Truax in May 1984. Dr. Truax was a neurologist retained by NWNL to evaluate Gilmore's medical status. He stated in his report that he did not feel Gilmore was disabled from employment and recommended that she limit any lifting with her left arm and avoid repetitive movements with her left arm and hand. Dr. Truax did not make any recommendation as to whether Gilmore could work full-time or only part-time.

Abramowski sent the Truax report to Dr. Bromer on May 31, 1984 and requested Bromer's comments on those recommendations and findings. Abramowski testified that he intended to place "primary reliance" on Dr. Bromer's opinion on the conditions under which Gilmore could return to work. Dr. Bromer responded to the request in a report dated June 25, 1984, indicating that he agreed with the diagnosis and stating that part-time work was all Gilmore could handle until her endurance improved. He also listed restrictions that should be imposed on any job she was given.

The information in the Truax report was also forwarded to Carol Curtis, a manager in Control Data's Disability Management Department. Curtis discussed the report with Patricia Brown, a human resources administrator at Control Data. At that time neither NWNL nor Control Data had received a clarifying report from Dr. Bromer regarding Gilmore's ability to return to work. Curtis and Brown then decided to have Gilmore examined by the company medical advisor.

At the request of Control Data, Gilmore was examined on June 25, 1984, by Dr. Thomas Jetzer, then associated with the Airport Medical Clinic. Dr. Jetzer is currently a consultant for Control Data. He performed a physical examination but did not conduct any tests, take x-rays, or order any lab work. Dr. Jetzer's report found that Gilmore had no "significant orthopedic disability." He stated in his report that Gilmore was functionally capable of returning to work full-time in a clerical or administrative assistant position. Although his written report was not received by Control Data until July 16, 1984, Patricia Brown testified that she had a telephone conversation with Dr. Jetzer on June 25, 1984, in which Jetzer stated that Gilmore was released to return to work immediately with minor restrictions.

On June 27, 1984, Control Data offered Gilmore a position as a "Facility Service Coordinator, Grade 5." The letter stated that "accommodations have been made to the physical restrictions established by the Corporate Medical Advisor." Gilmore rejected this offer because it did not include a part-time restriction as she believed her physician had recommended. On July 2, 1984, Control Data notified her that because she had rejected the offer, she was being placed on a personal leave of absence for 30 days, after which time she must either return to work or be terminated, and that the termination would be considered voluntary. Gilmore responded that she was waiting for an offer of a job that met her medical restrictions. No other position was offered to her, and she was terminated effective August 3, 1984.

## ISSUES

1. Does the evidence support the jury's verdict that Control Data breached its contract of employment with Gilmore?

2. Did the trial court err in denying Control Data's motion for new trial?

3. Did the trial court err in determining that Control Data did not discriminate against Gilmore on the basis of disability and failure to make reasonable accommodation?

## ANALYSIS

■ 1. Control Data first argues that the question of whether the contract of employment was breached should not have been submitted to the jury. Control Data

made no objection at trial when the jury was instructed on the question and did not raise this issue in its motion for new trial. We do not consider this argument on appeal. *See Duchene v. Wolstan,* 258 N.W.2d 601, 606 (Minn.1977).

On appeal, our review of a jury's special verdict is limited.

> It is well settled that we will set aside an answer to a special verdict question only when it is perverse and palpably contrary to the evidence. * * * If the answers to special verdict questions can be reconciled on *any* theory, the verdict will not be disturbed.

*Hauenstein v. Loctite Corp.,* 347 N.W.2d 272, 275 (Minn.1984) (emphasis in original). When reviewing a jury verdict on appeal, this court considers the evidence in the light most favorable to the prevailing party, and the verdict will not be disturbed if the evidence reasonably tends to support it. *Kuehl v. National Tea Co.,* 310 Minn. 48, 50, 245 N.W.2d 235, 237 (1976).

Control Data argues that the evidence is insufficient to support the finding that the contract was breached. Control Data contends there is no evidence to support an interpretation of the contract which would require the company to offer a job which was within the restrictions imposed by Gilmore's own physician. The company further contends that no breach occurred because it fulfilled the requirements in the handbook when it offered Gilmore a job based on the opinions of Drs. Jetzer and Truax.

The language in the handbook states that an employee can return to work after "an appropriate physician" has signed a release. Another paragraph states that the employee should notify the manager or personnel office as soon as "your physician" indicates work can be resumed. If "the physician" has provided medical restrictions, the company will try to offer a job within 30 days of the medical release date. Carol Curtis testified that she was responsible for interpreting this policy, and that the words "the physician" could be interpreted to mean the same as "your physician." She also testified that Gil-

more's physician, Dr. Bromer, was an "appropriate physician." Furthermore, both the NWNL Plan Administrator and Control Data sought Dr. Bromer's opinion on Gilmore's ability to return to work.

■ Considering the testimony about the interpretation of the terms in the contract, we conclude there is evidence in the record which reasonably supports the jury's finding that the contract was breached.

2. Control Data asserts as grounds for its motion for new trial that excessive damages were given under the influence of passion or prejudice and that the verdict is not justified by the evidence.

■ The trial court has broad discretion in determining whether a new trial should be granted based on the claim that the jury awarded excessive damages. *Bigham v. J.C. Penney Co.,* 268 N.W.2d 892, 898 (Minn.1978). A new trial should not be granted unless the verdict is so contrary to the preponderance of the evidence as to imply that the jury failed to consider all the evidence or acted under a mistake or from an improper motive or bias. *LaValle v. Aqualand Pool Co., Inc.,* 257 N.W.2d 324, 328 (Minn.1977). The trial court has heard the testimony and observed the witnesses and is in a better position to determine whether the damages were given under the influence of passion and prejudice. In the absence of a clear abuse of that discretion, the decision will not be reversed. *Id.*

■ The measure of damages for breach of an employment contract is the compensation which an employee who has been wrongfully discharged would have received had the contract been carried out according to its terms. *Zeller v. Prior Lake Public Schools,* 259 Minn. 487, 493, 108 N.W.2d 602, 606 (1961). This was the measure of damages the jury here was instructed to use.

The jury awarded Gilmore $80,000 in damages and wrote in pen on the special verdict form that court costs and attorney fees were also awarded. Testimony at trial established that Gilmore's monthly salary was $1,380. At the time of trial, 47.5 months had passed since her termination.

Based on those figures, Gilmore's lost wages were $65,550, and Gilmore's attorney stated in his closing argument:

> I could say, "Isn't it reasonable that she would have received some increases?" That would be speculation because maybe she wouldn't have, but that [$65,-550] is the hard number, that's what she is entitled to if you give your verdict to Diane Gilmore.

Based on these remarks, Control Data argues that the damages awarded should have been limited to $65,550.

■■■■ While at first light it may appear that Gilmore was limiting her claim by the remarks made at closing argument, the right to recover is determined by the judge's charge to the jury. Control Data did not object to the instruction given to the jury. There was no limitation that the damages were to extend only through the date of trial. The verdict is supported by the court's instruction and by the evidence in the record. Further, the fact that the jury wrote in pen on the special verdict form to award costs and attorney fees is superfluous and does not otherwise impair the verdict.

3. In its determination on Gilmore's claims of discrimination and failure to make accommodation, the trial court found that Gilmore failed to establish that the reasons stated by Control Data for her termination were pretextual or that her disability was a substantial causative factor in the decision to terminate her. The trial court also found that Control Data did not discriminate against her by failing to make reasonable accommodation. Gilmore contends that the trial court could not make factual findings on the discrimination claims which were inconsistent with the jury's verdict on the contract claim.

On review, this court must determine whether the trial court's findings are clearly erroneous. *See* Minn.R.Civ.P. 52.01. The court's findings that Gilmore failed to prove the allegations of discrimination will not be set aside "if they are reasonably supported by evidence in the record considered as a whole." *Hubbard v. United Press International, Inc.*, 330 N.W.2d 428, 441 (Minn.1983).

■■■■ Gilmore's claim is governed by the three part *McDonnell Douglas* analysis for determining violation of the Minnesota Human Rights Act. *Anderson v. Hunter, Keith, Marshall & Co.*, 417 N.W.2d 619, 626 (Minn.1988). The employee first must prove a prima facie case of discrimination by establishing that she is a member of a protected group, that she sought and applied for opportunities that the employer was making available to others, that she was denied the opportunities, and that the opportunities remained available or were given to nonmembers of a protected group. *See Sigurdson v. Isanti County*, 386 N.W.2d 715, 720 (Minn.1986). Gilmore sought a return to work job under Control Data's disability return to work procedure. Because these jobs are available only to employees who have been on disability leave, we conclude the trial court was correct in determining that she was not treated any differently due to her disability.

The trial court went on to find that even if a prima facie case were established, Control Data demonstrated legitimate reasons for the termination. There was testimony and correspondence in the record showing that Gilmore was terminated as a result of her refusal to accept the job offered to her. Gilmore's decision to reject the job was voluntary. While she argued she was justified in refusing the job because it did not meet the part-time restrictions of her own physician, the trial court noted, and we agree, that this fact does not provide any inference that her rejection of the job was not the true reason for the termination. Also, there was evidence in the record showing that Control Data had offered her a job which was consistent with the opinions of Dr. Jetzer and Dr. Truax. Control Data was entitled to rely on competent medical evidence in making determinations regarding an employee's ability to perform a job. *See Lewis v. Metropolitan Transit Corp.*, 320 N.W.2d 426, 430 (Minn.1982). Control Data's reliance on the recommendations of its physician was reasonable. We find there is evidence here to support

the trial court's decision that her disability was not a substantial causative factor in her termination.

Finally, Gilmore's contract claim and her discrimination claims do not involve identical issues. Gilmore's contract claim was based on whether Control Data was required to offer her a position approved by her own physician and whether any obligations were breached under the disability policy. Her discrimination claims required her to show whether she was denied a benefit made available to a nonmember of her protected class due to her disability and whether Control Data's reasons for her termination were pretextual. The trial court's findings on the discrimination claims are not inconsistent with the jury's verdict on the contract claim.

## DECISION

Affirmed.