**Richard L. BROOKS, Appellant,**

v.

**DOHERTY, RUMBLE & BUTLER, et al., Respondents.**

No. C2-91-626.

Court of Appeals of Minnesota.

Feb. 18, 1992.

Review Denied April 29, 1992.

Joseph A. Nilan, Lang, Pauly & Gregerson, Ltd., Christopher R. Walsh, Minneapolis, for Richard L. Brooks, appellant.

Curtis D. Forslund, Tamara Hjelle Olsen, Gray, Plant, Mooty, Mooty & Bennett, P.A., Minneapolis, for Doherty, Rumble & Butler, et al., respondents.

Considered and decided by LANSING, P.J., and HUSPENI and SHORT, JJ.

## OPINION

HUSPENI, Judge.

Appellant challenges the jury's finding of no actual malice and the trial court's determination that respondents were not liable for defamation because of a qualified privilege. Respondents allege the record was insufficient to prove fraud. We affirm in part, reverse in part and remand.

## FACTS

Appellant Richard Brooks is an attorney who specializes in labor law. Since graduating from law school in 1974, appellant has worked for the National Labor Relations Board, clerked for United States District Court, and worked as an associate for law firms in Dallas, Texas and in Chicago, Illinois. In 1983, appellant joined the firm of Holmes and Graven in Minneapolis for the specific purpose of creating a labor department. They agreed that if appellant did not generate a large enough client base within a year, his employment at Holmes and Graven would end. Appellant's job ended for that reason in November 1984.

In his subsequent job search, appellant applied to respondent Doherty, Rumble and Butler (DRB). Respondent John McGirl is in charge of the labor law department at DRB's Minneapolis office. In January

1985, McGirl contacted appellant about an opening in the labor department. This "opening" resulted from the departure of two attorneys and McGirl's month-long honeymoon planned for March 1985. There would thus have been only one junior associate left in the department. McGirl testified that he either had to hire someone quickly or cancel his honeymoon. Appellant told DRB that he was looking for a secure job on a partnership track; he was not interested in a temporary position.

After a series of interviews with appellant, DRB's attorneys in the labor department, and senior shareholder Eugene Warlich, and president William Cosgriff all agreed that appellant was not the "man for the job" and did not have a "proper fit" with the firm. They said he was too intense; he made them uncomfortable. Despite these reviews, McGirl extended an offer to appellant due to the staffing crisis and McGirl's scheduled honeymoon. McGirl falsely told appellant that the attorneys "unanimously approved" appellant and all wanted appellant to join the firm.

Warlich met with appellant to outline the terms of employment. Appellant would have a two-year term, with serious consideration for shareholder status after the first year. If appellant did not achieve shareholder status after the first year, he would receive serious consideration the second year. If he still did not achieve shareholder status after two years, his job would end. Appellant would earn $50,000 salary with an additional $5,000 for dues/fees. Warlich set out these terms in a memorandum on February 27, 1985. Appellant began work March 4, 1985.

Appellant asserted at trial that his performance on the job was well received at DRB. By contrast, DRB asserted that several people expressed dissatisfaction with appellant's style and personality, found him offensive and demanding, and sought to have him removed from the department. Although appellant claims he had no notice of this sentiment among his colleagues and staff, he did testify that he felt he was treated differently than other attorneys in the firm. For instance, DRB did not place appellant's name on the letterhead, did not make a personnel file for him, and excluded him from several programs within the firm.

Early in August 1985, DRB merged with the law firm of Stopelstad, Brown & Smith and absorbed its attorneys into DRB's departments.

On August 6, 1985, McGirl met with appellant. Appellant testified that McGirl was hostile; he cursed at appellant and told him that if he did not resign, DRB would fire him and give him a negative reference, and his career would be over. Respondents disputed this account and contended the meeting was to discuss appellant's work and attitude.

On August 12, McGirl attended a board meeting to discuss appellant's future with the firm. The board left the matter up to McGirl, since he supervised appellant. McGirl then drafted a memo which stated in part, "[T]he firm will expend no further funds to market you as a member of the firm."

McGirl met briefly with appellant on August 13 and gave him this memo. Appellant testified that McGirl was angry. He told appellant he was "officially terminated" and should clear out of the office. After this discussion, appellant considered himself fired. McGirl admitted being angry, but contended that he sent appellant to work in the St. Paul office.

Appellant returned to the office later that night to retrieve the files of personal clients whom he had brought with him to DRB. McGirl acknowledged that these clients/files were appellant's, but he wanted the clients to sign formal releases in order to protect DRB. Appellant contacted his clients per McGirl's instructions.

The next morning, appellant called Cosgriff to set up a meeting. According to appellant, Cosgriff told him, "You are no longer in this firm." Appellant secured an attorney who contacted Cosgriff in an attempt to reschedule the meeting, but the meeting never occurred.

McGirl testified that at first he informed appellant he would be transferred to St. Paul. The next day, when appellant's files

were gone, he assumed appellant had resigned. On August 20, DRB began processing appellant's final paycheck. On August 27, the board considered appellant's status with the firm and terminated his employment formally. A letter dated August 30 stated the following reasons for termination:

The immediacy of your termination * * * is based upon your failure to report to work since Tuesday, August 13th, your refusal to meet with me to discuss the subject of your continued employment with the firm, and your request to your clients that they instruct Doherty, Rumble & Butler, P.A. to deliver all files in our possession and control directly to your home.

Though addressed to appellant, this letter was copied and sent to eight other individuals in the firm.

Appellant sued respondents for breach of contract, fraud, emotional distress, and defamation. After a jury trial, the jury returned a special verdict in favor of appellant on all issues except emotional distress. The jury awarded $83,000 in compensatory damages for breach of contract, $175,144 in compensatory damages for fraud, and $2,241,856 in compensatory damages for defamation. However, the jury found that respondents had not acted with actual malice when they defamed appellant. The trial court concluded as a matter of law that respondents were protected from liability for their defamation by a qualified privilege. In addition, the trial court reduced the damages for breach. Appellant moved for judgment notwithstanding the verdict (JNOV) on the issue of actual malice. Respondents moved for JNOV to set aside the damage award for fraud. After denying both parties' motions, the court entered judgment awarding appellant $42,892 for breach of contract and $182,869.52 for fraud. The qualified privilege invalidated the damages for defamation.

### ISSUES

1. Did the trial court err in concluding as a matter of law that respondents were protected from liability for defamation by a qualified privilege?

2. Did the trial court err when it denied JNOV on the issue of actual malice?

3. Did the trial court err when it reduced appellant's breach of contract damages to account for mitigation?

4. Did the trial court err when it denied respondents' motion for JNOV on the issue of fraud?

### ANALYSIS

#### I.

■ Respondents argue that the qualified privilege issue is not properly before this court because appellant moved for judgment notwithstanding the verdict only on the issue of actual malice. When a party fails to raise an issue before the trial court in a motion for amended findings or new trial, our review on appeal is limited to whether the evidence supports the court's findings of fact and whether those findings support the conclusions of law. *Gruenhagen v. Larson*, 310 Minn. 454, 458, 246 N.W.2d 565, 569 (1976). While we acknowledge that procedurally appellant would receive limited review under *Gruenhagen*, we also note that appellant, in challenging the existence of a qualified privilege, has raised a question of law. *See Lewis v. Equitable Life Assurance Soc'y*, 389 N.W.2d 876, 890 (Minn.1986). This court conducts de novo review of questions of law. Minn.R.Civ.P. 52.01; *A.J. Chromy Constr. Co. v. Commercial Mechanical Servs., Inc.*, 260 N.W.2d 579, 582 (Minn. 1977).

■ Minnesota recognizes a qualified privilege which exempts an employer from liability for defamatory statements [1] about an employee so long as the statements are made in good faith and for a legitimate

---

1. In order for a statement to be defamatory at common law, the statement must be false, published to a third party and likely to harm plain-tiff's reputation. *Stuempges v. Parke, Davis & Co.*, 297 N.W.2d 252, 255 (Minn.1980).

purpose. *Stuempges v. Parke, Davis & Co.*, 297 N.W.2d 252, 257 (Minn.1980).

The law is that a communication, to be privileged, must be made upon a proper occasion, from a proper motive, and must be based upon reasonable or probable cause. When so made in good faith, the law does not imply malice from the communication itself, as in the ordinary case of libel. Actual malice must be proved, before there can be a recovery, and in the absence of such proof the plaintiff cannot recover.

*Stuempges*, 297 N.W.2d at 256–57, *quoted in Hebner v. Great N. Ry.*, 78 Minn. 289, 292, 80 N.W. 1128, 1129 (1899).

This qualified privilege for employers is rooted in public policy concerns:

It is in the public interest that information regarding an employee's discharge be readily available to the discharged employee and to prospective employers, and we are concerned that, unless a significant privilege is recognized by the courts, employers will decline to inform employees of reasons for discharges.

*Lewis*, 389 N.W.2d at 890.

The proper purpose of an employer's statement is directly connected to this public policy rationale. "[T]he employer has an important interest in protecting itself and the public against dishonest or otherwise harmful employees." *McBride v. Sears, Roebuck & Co.*, 306 Minn. 93, 97, 235 N.W.2d 371, 374 (1975). Therefore, courts have found proper purposes to include an employer's ability to evaluate an employee honestly and communicate that review to prospective employers, *Stuempges*, 297 N.W.2d at 257, and an employer's efforts to protect the best interests of the business. *Wirig v. Kinney Shoe Corp.*, 461 N.W.2d 374, 380 (Minn.1990). Whether a proper purpose exists is a question of law. *Id.*

■ Whether a proper occasion exists to warrant a qualified privilege is also a question of law for the court to determine. *Lewis*, 389 N.W.2d at 889. "[A]n employer's communication to an employee of the reason for discharge may present a proper occasion upon which to recognize a quali-

fied privilege." *Id.* at 890. Based upon that rationale, Minnesota courts have granted a qualified privilege to communications between an employer and employee in cases arising from termination of employment. *E.g., Frankson v. Design Space Int'l*, 394 N.W.2d 140, 145 (Minn.1986); *McBride*, 306 Minn. at 98, 235 N.W.2d at 374; *Karnes v. Milo Beauty & Barber Supply Co.*, 441 N.W.2d 565, 568 (Minn. App.1989), *pet. for rev. denied* (Minn. Aug. 15, 1989).

"Qualified privilege rests, however, on more than having a proper occasion and purpose." *Wirig*, 461 N.W.2d at 380.

The employer must also have reasonable or probable grounds for believing in the validity of the statement, even though hindsight might show the statement to be false.

*Id.* Determination of reasonable grounds also seems to be a question of law, unless the evidence "permits of more than one conclusion," when the question becomes one of fact for the jury. *Id.* at 380 n. 4. In cases where the court has found that the employer had reasonable grounds to believe the statements were true, the evidence has shown the employer made some effort to investigate the situation in order to determine the accuracy of the statements about the employee. *Id.* at 380.

Appellant argues that respondents established no proper occasion, proper purpose, or reasonable grounds to support the court's finding of a qualified privilege. We disagree.

■ DRB had the proper occasion to include these statements in appellant's termination letter. *See Frankson*, 394 N.W.2d at 144. Further, DRB made these statements for the proper purpose of informing appellant of the reasons for his termination. *See Lewis*, 389 N.W.2d at 890.

■ Finally, because of the substantial conflict in testimony regarding the termination of appellant, the trial court necessarily had to weigh this evidence and make factual determinations in order to find that respondents had reasonable grounds to believe their statements. Although this question was not presented to the jury, the

disputed evidence on respondents' knowledge, investigation and intent created a fact issue for the court to determine. *See Wirig*, 461 N.W.2d at 380 n. 4.[2] The record contains sufficient evidence to support this finding. Respondents presented evidence regarding their interpretation of appellant's conduct at the time they sent the letter. In addition, the record shows that appellant did not report to work after August 13, that he removed his clients' files from DRB's premises and notified the clients to forward releases to DRB, and that neither he nor his attorney ever met with Cosgriff. Each of these events did occur. Although appellant disputes both underlying circumstances and whether such events constitute cause for his termination, we cannot say DRB did not have reasonable grounds to believe the statements set forth in the termination letter.

We emphasize that the qualified privilege is by no means a license for an employer to lie or mar an employee's record in termination proceedings. Indeed, the law provides a safeguard against such abuse of the privilege by permitting an employee to recover damages when actual malice is shown. *Stuempges*, 297 N.W.2d at 257. In the absence of proof of actual malice, however, the court has allowed defamatory statements to remain on an employee's record. *Frankson*, 394 N.W.2d at 145; *see also Hunt v. University of Minn.*, 465 N.W.2d 88, 92–93 (Minn.App.1991) (where no evidence of malice, co-worker's defamatory reference privileged); *Karnes*, 441 N.W.2d at 568–69 (where no evidence of malice, intra-office memo containing defamatory statements covered by qualified privilege). Based on this record, the trial court did not err as a matter of law when it granted respondents a qualified privilege.

## II.

Appellant next alleges the trial court erred when it failed to grant judgment notwithstanding the jury's verdict that respondents acted without malice. We disagree.

Judgment notwithstanding the verdict "may be granted only when the evidence is so overwhelming on one side that reasonable minds cannot differ as to the proper outcome."

*Lamb v. Jordan*, 333 N.W.2d 852, 855 (Minn.1983) (quoting 4 D. McFarland & W. Keppel, Minnesota Civil Practice § 2402 (1979 and Supp.1982)). On appeal from a denial of JNOV, this court must view all of the evidence in a light most favorable to the verdict and must not weigh the evidence or the credibility of the witnesses. *Id.*

Once respondents established a qualified privilege, the burden shifted to appellant to prove that respondents abused that privilege by actual malice. *See Lewis*, 389 N.W.2d at 890. Whether respondents abused the privilege by actual malice is a question for the jury. *Id.* When reviewing a special jury verdict, this court may only reverse if it finds the verdict palpably contrary to the evidence. *Wirig*, 461 N.W.2d at 381.

Actual malice is "actual ill will, or a design causelessly and wantonly to injure plaintiff." *McBride*, 306 Minn. at 98, 235 N.W.2d at 375. Malice may be proven by evidence that leads to an inference that respondents knew the statements were false, by extrinsic evidence of personal ill feeling, or by intrinsic evidence such as exaggerated language, the character of the language used, or the extent of publication. *Frankson*, 394 N.W.2d at 144.

The record before us shows conflict between appellant, McGirl, and other DRB attorneys. This evidence does not dictate a finding of actual malice, however. The jury was able to balance this evidence against that offered by respondents to explain their conduct. The record contains evidence upon which the jury could reasonably have concluded that the conflicts between appellant and respondents did not

---

**2.** There is no indication in the record that appellant requested that the court submit the question of reasonable grounds to the jury.

reach the level of actual ill will or a desire to injure appellant.

The trial court instructed the jury:

A statement is made with actual malice if the statement is made from ill will and improper motives or without cause and wantonly for the purpose of injuring a person.

The jury had the ultimate responsibility to weigh the evidence and the credibility of witnesses during this four-week trial. *See Bari v. Control Data Corp.*, 439 N.W.2d 44, 47 (Minn.App.1989), *pet. for rev. denied* (Minn. July 12, 1989). For this reason, we give great deference to the jury's findings. Based on the record, we cannot conclude that the jury's verdict is palpably contrary to the evidence.

### III.

■ Appellant argues the trial court erred when it reduced the amount of damages for breach of contract.[3]

■ The measure of damages for breach of an employment contract is the amount of compensation which an employee would have received had the contract been carried out. *Gilmore v. Control Data Corp.*, 442 N.W.2d 835, 838 (Minn. App.1989). Those damages may be reduced by the earnings of new employment (mitigation). *Soules v. Independent Sch. Dist. No. 518*, 258 N.W.2d 103, 106 (Minn. 1977).

■ At trial, appellant's expert testified that appellant suffered approximately $75,-000 of lost income and benefits from the breach and earned approximately $41,000 in income from various sources. The expert also calculated the financial effect of the breach upon appellant's employability from the time of breach in 1985 until the trial in 1989.

At the close of evidence, the trial court instructed the jury on mitigation:

In determining the amount of damages, you should consider that one who is in-

jured or harmed has a duty to act reasonably in seeking employment, protecting his reputation, and obtaining treatment. [Respondents] have the burden of proving that [appellant] did not act reasonably to mitigate his damages. [Appellant] is limited to those damages which he would have suffered if he had acted reasonably to mitigate his damages.

In the special verdict, the jury found that respondents breached the employment contract and awarded appellant $83,000 in compensatory damages. The trial court then reduced that figure by $41,920, a number calculated from evidence of other income appellant had earned after termination. In the memorandum accompanying the order for judgment, the trial court explained its reasoning:

Prior to the submission of the case to the jury, the parties' attorneys were advised that the court would reduce any award of contract damages by the amount of professional income which Brooks received during the period in question. Thus, the court has proceeded accordingly.

This action of the trial court in reducing the award of contract damages would have been proper had the court not given the mitigation instruction to the jury. As the record stands, however, damages were reduced twice. Based upon the mitigation instruction, the jury returned a damage award that fell reasonably within the damages presented at trial. The court then reduced that award again based on essentially the same evidence regarding mitigation that the jury had before it. We cannot affirm a double reduction because it is contrary to the record and the law. The jury's award of $83,000 plus interest must be reinstated.

### IV.

Respondents, in their notice of review, challenge the trial court's denial of JNOV on the issue of fraud. Respondents assert

---

**3.** Appellant failed to raise this issue before the trial court in a motion for new trial. Thus, our review is limited to whether the evidence supports the trial court's findings of fact and wheth-

er the findings support the conclusions of law. *Gruenhagen*, 310 Minn. at 458, 246 N.W.2d at 569.

that appellant's claim, and thus his remedy, sounds in contract, not in tort.

■ Respondents cite *Stowman v. Carlson Cos.*, 430 N.W.2d 490, 493 (Minn. App.1988), *pet. for rev. denied* (Minn. Jan. 13, 1989), as support for their argument that "discharge from employment is actionable, if at all, because it constitutes a breach of the employment contract." We conclude, however, that respondents' reliance on *Stowman* is misplaced. Appellant may raise, and indeed has raised, two independent causes of action: fraud in the inducement to the contract and breach of the employment contract. *See McDonald v. Johnson & Johnson*, 776 F.2d 767, 770 (8th Cir.1985); *Engen v. Merchants & Mfrs. State Bank*, 164 Minn. 293, 298, 204 N.W. 963, 965 (1925). The *McDonald* court recognized that a plaintiff could maintain these two causes of action. That court did not discuss how the damages in each cause of action would be proven.

■ In order to recover under theories of both contract and tort, appellant had the burden of proving separate damages for fraud and for breach, lest the damage award be duplicative. *See Wirig*, 461 N.W.2d at 379 (holding double recovery for same harm prohibited). We conclude that appellant has borne that burden. In his complaint, he alleged that the breach of his employment contract caused him to suffer a loss of income.[4] In addition and in contrast, appellant alleged that the fraud perpetrated by respondents caused him to enter into a situation that ultimately caused emotional distress, damage to his personal and professional reputation, lost income, and a move to Arizona.

At trial, appellant presented evidence relevant to the issue of fraud that was separate and distinct from that which supported his contract claims. He testified to the long-term financial difficulty he and his wife experienced as a consequence of his fraudulent inducement to enter the employment contract with DRB. In addition, he testified to the disgrace of borrowing mon-

ey to meet expenses; the loss of clients; the strain on appellant, his wife and their two small children; and the anger and depression he experienced. He testified that in each interview for employment the firm would ask the reasons for his termination, and that no firm offered him employment after he divulged this information. His inability to procure a job with any firm in Minnesota caused him to seek employment in Arizona where he had business contacts. The move to Arizona was not by choice, because appellant's family lives in Minnesota. Appellant, who moved first to Arizona, testified that the five-month separation from his wife and children and their ultimate move from Minnesota was difficult and upsetting.

Appellant presented financial information that demonstrated his indebtedness. An economist who calculated appellant's financial losses compared appellant's value had he left DRB in good standing with his present ability as "damaged goods" to find employment with a large labor firm. At the time of trial, appellant was working for a small commercial law firm, practicing in the areas of real estate, small corporate, landlord/tenant and collections.

■ Respondents further contend that even if appellant proved fraud, he may only recover out-of-pocket losses. Again, we cannot agree. Generally, damages arising from fraud and misrepresentation should be measured by the plaintiff's out-of-pocket loss. *B.F. Goodrich Co. v. Mesabi Tire Co.*, 430 N.W.2d 180, 182 (Minn. 1988). That rule most clearly applies, however, in a transactional context involving a purchaser who relies on the fraudulent statements of a seller. *Id.* at 183. The rule does not work as well in cases where a "defendant's misrepresentation prevents plaintiff from taking measures to protect the value of the property it already has." *Id.* In such a case, the court has carved out an exception to the out-of-pocket rule in order to restore the plaintiff to his former

---

**4.** Our earlier discussion of the damages awarded for breach of contract will not be repeated here.

status in life. The *Goodrich* court reasoned:

> Because of his misrepresentation, the trier of fact has found that plaintiff lost its business. This direct economic loss is not measurable by the out-of-pocket rule; application of that rule would leave plaintiff's loss uncompensated and would not restore plaintiff to its former position. Under these circumstances, the trial court properly allowed plaintiff to recover its economic loss from the destruction of the business, measured by the value of the business before the misrepresentation (based on capitalization of past earnings) and the value after.

*Id.* This reasoning is compelling in appellant's case. Here, the "business" is appellant's legal career as a labor attorney. Appellant demonstrated at trial that his career has been seriously damaged by DRB's misrepresentations which led to his hiring and firing. Recovery of strict out-of-pocket losses would have failed to compensate appellant for the fraud which damaged him beyond any loss he suffered from the breach of his employment contract. The effect of respondents' fraud has continued to harm appellant. The trial court properly concluded that applying the out-of-pocket rule to appellant's case "would leave [his] loss arising from the fraud uncompensated."

## DECISION

The trial court properly granted respondents a qualified privilege. The trial court did not err in denying JNOV on the issue of actual malice when the jury's verdict was not palpably contrary to the evidence. The trial court erred when it reduced breach of contract damages after the jury returned a damage award which took into account appellant's efforts at mitigation. The trial court properly denied JNOV on the issue of fraud when appellant raised and proved distinct claims and damages arising from breach of contract and fraud in the inducement to the contract.

Affirmed in part, reversed in part, and remanded.

SHORT, Judge (concurring in part, dissenting in part).

I concur as to the qualified privilege issue. Because neither party moved for amended findings or a new trial our scope of review is limited. *Louko v. Village of Hibbing*, 222 Minn. 463, 465, 25 N.W.2d 234, 235 (1946). Thus, the issue of whether the trial court erred in ruling that DRB was protected from liability for defamation by qualified privilege was waived and is not properly before us. *Sauter v. Wasemiller*, 389 N.W.2d 200, 202 (Minn.1986).

I dissent and would affirm the trial court's award of contract damages. First, appellant waived this issue by not moving for a new trial or amended findings. *Sauter*, 389 N.W.2d at 202. Second, the record demonstrates (a) both parties were advised prior to submission of the case that the trial court would reduce any award of contract damages by the amount of professional income received by Brooks, (b) neither party objected to this decision or the related jury instructions, and (c) Brooks testified he was entitled under the parties' contract to be paid $4,583 per month for 18⅛ months (a total of $83,000). Under these facts, Brooks is barred from challenging the trial court's mitigation of contract damages. *See Soules v. Independent School Dist. No. 518*, 258 N.W.2d 103 (Minn.1977). In addition, there is ample evidence to support the trial court's decision to reduce the award of contract damages. *See Levienn v. Metropolitan Transit Comm'n*, 297 N.W.2d 272, 273 (Minn.1980).

I also dissent and would modify the trial court's award of fraud damages. While Brooks may recover in tort and contract, he cannot aggregate damages so as to collect a double recovery. *See McDonald v. Johnson & Johnson*, 776 F.2d 767, 769 (8th Cir.1985); *E.H. Boerth v. LAD Properties*, 82 F.R.D. 635 (D.Minn.1979). Under the facts of this case, the award of fraud damages should be reduced by a total of $54,-062 (the $11,797 Brooks received in a settlement with his subsequent employer, the $1,185 he received in unemployment com-

pensation, and the $41,080 in contract damages).