# United States Court of Appeals
## For the Eighth Circuit

_____

No. 11-2932
_____

Jeffrey Scott Sherman

*Plaintiff - Appellant*

v.

Rinchem Company, Inc.

*Defendant - Appellee*

_____

Appeal from United States District Court
for the District of Minnesota - Minneapolis

_____

Submitted: May 16, 2012
Filed: August 6, 2012

_____

Before RILEY, Chief Judge, MELLOY and SMITH, Circuit Judges.

_____

SMITH, Circuit Judge.

Jeffrey Scott Sherman appeals from the district court's[1] grant of summary judgment to Rinchem Company, Inc. ("Rinchem") on Sherman's defamation claim. Rinchem had fired Sherman after he allegedly lied in the course of Rinchem's

_____

[1]The Honorable Patrick J. Schiltz, United States District Judge for the District of Minnesota.

investigation of complaints about his behavior. Sherman disputes Rinchem's allegation and contends that Rinchem's accusation defamed him and compelled him to reveal to prospective employers that he had been fired for lying. Sherman alleges that, viewing the evidence in the light most favorable to him, genuine issues of material fact exist regarding his defamation claim. Additionally, Sherman asserts that Rinchem failed to provide him with interview notes between himself and Rinchem's human resources director and thus caused spoliation of evidence. Sherman contends that the district court should have granted his motion for summary judgment as a sanction for Rinchem's actions. We affirm.

I. *Background*

Sherman worked at Advanced Technology Materials, Inc. (ATMI) in Bloomington, Minnesota, from mid-2006 through December 2007. On December 26, 2007, Rinchem hired Sherman to provide shipping services to ATMI on an in-house basis. At that point, Sherman became Rinchem's employee. Rinchem notified Sherman of his termination on April 22, 2008, less than four months after his hire date.

While employed at Rinchem, Sherman developed a "bad relationship" with one of his coworkers, Isabelle Thill. Thill had previously worked at ATMI with Sherman. On at least two occasions, Thill made an obscene gesture at Sherman. On another occasion, Thill called Sherman "weird." Sherman was offended by the comment, and, after not speaking to her for a day, he asked her to apologize to him for the remark. Although Thill did apologize, Sherman found it sarcastic and insincere. Following the apology, Sherman resumed giving Thill the silent treatment.

Sherman rollerblades around Lake Nokomis in Minneapolis, Minnesota, nearly every day. During office banter, Sherman told some coworkers that two women had reported to police that Sherman was allegedly stalking them at Lake Nokomis. Two women, on separate occasions, had in fact complained about Sherman to police regarding his behavior at Lake Nokomis, and one of those women, Delanie Marie

Hansen, accused him of stalking. According to Sherman, he told coworkers that Hansen had "threatened to get a restraining order" against him and that the other woman had "complained about [Sherman] saying hi to her."

In reality, Hansen did not merely *threaten* to get a restraining order against Sherman; she actually *obtained* one against him. This temporary restraining order (TRO) was in effect for approximately five weeks before the state court vacated the TRO for Hansen's failure to appear at a court hearing. Sherman claims that he was not provided with notice of this TRO and that it was invalid because he received service of process by publication rather than by personal service.

Including the TRO that Hansen obtained, three restraining orders have been issued against Sherman. He and his ex-wife received mutual orders for protection against one another prior to their divorce; after the divorce was finalized, his ex-wife extended the order. Additionally, "long after [Sherman's] divorce was finalized," his ex-wife's new husband obtained a restraining order against him.

In April 2008, Rinchem employees complained to management about Sherman's workplace behavior. The record is unclear as to "who initially complained about Sherman." *Sherman v. Rinchem Co.*, No. 10-CV-2062 (PJS/FLN), 2011 WL 3471057, at *2 (D. Minn. Aug. 8, 2011) (unpublished). According to Sherman, on April 18, 2008, Gwen Inman, Director of Human Resources, who works in Rinchem's headquarters in New Mexico, told Sherman that Thill lodged the initial complaint. By contrast, Tasha Budlong, Human Resources Generalist, testified that Michelle "Micki" Kohanek, Sherman's direct supervisor, made the first complaint. According to Budlong, Kohanek contacted her, stating that she "had a situation . . . at the warehouse and that one of the employees was not allowing her to do her job." Around the same time, on April 17, 2008, Holly Ellison, one of Sherman's coworkers, sent an email to her supervisor, Ryan Swainey, to inform him that "things were getting disruptive at work." Specifically, Ellison asserted that Sherman was "upsetting Michelle Kohanek

and Isabelle [Thill]." Ellison forwarded the email to Budlong on April 18, 2008. Ellison did not know whether her complaint was the first one lodged against Sherman.

In response to these complaints, Rinchem issued an employee-counseling memo to Sherman on April 17, 2008. The memo informed Sherman that Rinchem "ha[d] received notification from other Rinchem employees of [Sherman's] disruptive behavior at ATMI" and that Rinchem was placing Sherman "on paid administrative leave" while it investigated those accusations.

Budlong and Inman conducted the investigation. Between April 17 and April 21, 2008, Budlong interviewed several of Sherman's coworkers, including Thill, Kohanek, Ellison, and Swainey, as well as warehouse employees James Carter and Craig Phipps. "The interviews focused primarily on Sherman's interactions with Thill, but some of the employees who were interviewed mentioned Sherman's comments about restraining orders and the women whom he had allegedly stalked at Lake Nokomis." *Sherman*, 2011 WL 3471057, at *2. According to Budlong's interview notes, both Thill and Kohanek reported that Sherman asked Ellison if he looked like a stalker. Budlong's notes also reflect that "Carter was told by Rinchem's ATMI employees about the charges brought against [Sherman] for stalking." Similarly, Kohanek informed Budlong "that [Sherman] was bragging to everyone about having restraining orders brought against him." Kohanek also told Budlong "that [Sherman] liked to rollerblade at a lake. He would wave at the lady and then one day she started flipping him off, he tried to talk with her but she called the police. Her boyfriend threatened to beat him up. He had no idea why any of this happened." Ellison reported to Budlong that she had "overhead conversations with [Kohanek] and [Sherman] about restraining orders and the lady at the lake." Likewise, Phipps stated that he "kn[ew] about the stalking orders."

On April 18, 2008, Inman interviewed Sherman. She asked Sherman "about [his] relationship with [Thill], specifically, whether [he] had made any unwanted

advances on her, whether [he] had ever called her or e-mailed her or attempted to see her outside of work." Sherman considered these questions "consistent with a sexual harassment investigation." Sherman testified that he and Inman discussed his "recent dispute" with Thill involving the remark that he was "weird" and the obscene gesture. During the April 18 interview, Inman did not ask Sherman about the restraining orders. Inman stated that, after the April 18 interview, "[i]t wasn't looking good" that Sherman would retain his job.

According to Inman, on Sunday, April 20, 2008, she "reviewed the investigative file and made a final determination that Rinchem should terminate plaintiff's employment." But Inman again interviewed Sherman on Monday, April 21, 2008, because she wanted "to look under every rock." According to Inman, her "mind [could] be changed." She wanted to ensure that she had "ma[d]e the right decision," so she was "checking [herself]" by conducting the April 21 interview. Inman testified that she "had not had access to everything [she] needed over the weekend," so she "was continuing to comb through things."

The April 21 interview began with Sherman asking Inman "what the status of the investigation was," and Inman responded that she was "in a bit of a quandary because [she did not] have anything yet." Then, Inman asked Sherman whether he "had ever received any restraining orders." "The record is not clear as to precisely what Sherman said in response to Inman's question." *Sherman*, 2011 WL 3471057, at \*3. In an April 23, 2008 letter to Rinchem appealing his termination, Sherman asserted that Rinchem had accused him "of lying about whether a restraining order has ever been issued against [him] that was *unrelated to [his] divorce*." (Emphasis added.) More than two years later, in his deposition, Sherman testified that he told Inman that the only persons "that had gotten a restraining order against [him] were [his] ex-wife

and her husband."[2] In any event, Sherman testified that Inman did not tell him why she was asking the question, but he "presumed that one of [his] coworkers had told her that." Sherman did not believe that Inman asked him whether he had discussed the restraining orders with his coworkers, but he testified that, "if she had asked me that, I would have said, yes, I have talked about that." According to Sherman, after Inman asked him whether he had restraining orders against him and he answered, she then asked him whether he had "any others." Sherman's "answer was absolutely not."

After the interview, Inman drafted a "termination counseling memo and sent it to [Swainey]." Later that day, Sherman received a voicemail from Swainey asking Sherman to attend a meeting on April 22, 2008. Sherman, Swainey, and Carter were present at the meeting, while Budlong participated via telephone. At that meeting, Swainey read the April 21, 2008 employee-counseling memo that Inman authored. Sherman's defamation claim derives from this memo, which provides, in relevant part:

> [Sherman] has created a disruptive work environment by telling fellow employees about non-work related questionable activities. During the course of the investigation[,] it was discovered that more than two employees heard [Sherman] talking about restraining orders that had been filed against him from women he had met during chance outdoor activities. With two of these employees, [Sherman] actually openly discussed these restraining orders. Female employees became concerned about his constant attentions and discussions relating to one of the female employees at Rinchem.

\* \* \*

<hr />

[2]The district court observed that Sherman stating that only his ex-wife and her husband had obtained restraining orders against him was "different from saying that the only restraining orders that had been entered against Sherman were restraining orders 'related to [his] divorce' because . . . the restraining order obtained by the husband of Sherman's ex-wife was not 'related' to his divorce." *Sherman*, 2011 WL 3471057, at \*3 n.1.

While there were several credible concerns brought out during the course of the investigation[,] our biggest concern is that [Sherman] was not forthcoming with all pertinent information. During the investigation the Director of Human Resources, Gwen Inman, asked [Sherman] several questions relating to the allegations that were brought out; including his discussions about restraining orders. [Sherman] indicated that the only restraining orders that he had received were those relating to his divorce. Upon examination of the other statements made during the investigation, this is obviously not the same information he had given others. It is our decision that [Sherman] has obviously lied to the Director of HRD during the course of this investigation.

The "[t]ype of [a]ction" portion of the memo stated that Sherman's "[t]ermination" was for "[t]heft or [o]ther [a]cts of [d]ishonesty." Sherman did not ask anyone what "theft or dishonesty" was because he understood it to mean "[l]ying to conceal whether [he] had restraining orders."

After Swainey read the memo, Sherman asked Budlong about the appeal process. Budlong replied that Sherman needed to send a letter to Rinchem explaining his side of the story. According to Sherman, Budlong told him that if he could prove that he did not have any restraining orders, he could get his job back, if it was still available.

On April 23, 2008, Sherman appealed his termination. In his letter to Rinchem, he wrote, in part:

I have been accused of lying about whether a restraining order has ever been issued against me that was unrelated to my divorce. I ABSOLUTELY HAVE NOT HAD A RESTRAINING ORDER ISSUED AGAINST ME OUTSIDE OF MY DIVORCE PROCEEDINGS. I will prove this later.

As "proof" that he had no other restraining orders, Sherman attached a court order that *vacated* the TRO that Hansen had against Sherman. "This order, of course, proved that a restraining order unrelated to Sherman's divorce *had* been entered against him." *Sherman*, 2011 WL 3471057, at *4. Nevertheless, Sherman stated that the order "vindicates me and shows that I haven't lied. I HAVE NEVER HAD A RESTRAINING ORDER ISSUED AGAINST ME OUTSIDE OF MY DIVORCE PROCEEDINGS." Rinchem reviewed and rejected Sherman's appeal.

On June 10, 2008, Sherman advised Rinchem by letter that Sherman would take legal action against Rinchem unless Rinchem "rescind[ed] [Sherman's] termination." In a June 19, 2008 letter from Rinchem's counsel to Sherman, Rinchem declined to reinstate Sherman. It denied making defamatory statements about Sherman. Furthermore, Rinchem agreed to "revise[] the April 21, 2008 Employee Counseling Memo to state simply that it has elected to end [Sherman's] employment due to a change of corporate direction." Rinchem concluded that such revision was "consistent with [Sherman's] status as an at will employee of Rinchem's." Rinchem advised Sherman that it had sealed the original memo and that it would not offer a reason for Sherman's "separation from employment" upon a prospective employer's inquiry.

Sherman had interviewed with 27 prospective employers by the time of his deposition. Only one of those interviews occurred before Rinchem revised the April 21 memo. According to Sherman, in all but "two or three" of the 27 interviews, he disclosed to prospective employers why Rinchem terminated him. Sherman testified that he did not disclose the reason for his termination in "two or three" of the interviews because "[t]hey did not ask [him]." Sherman would sometimes tell the interviewer that Rinchem terminated him for lying. On other occasions, he would initially tell the interviewer that he "was fired due to a change of corporate direction," but he would ultimately explain "what really happened" after the interviewer inquired as to what "a change of corporate direction" means.

-8-

Sherman filed suit in state court against Rinchem, alleging defamation, breach of contract, and tortious interference with prospective economic advantage. Rinchem removed the action to federal court. Following discovery, both parties moved for summary judgment. Rinchem sought summary judgment on the merits, while Sherman sought it as a sanction for spoliation of evidence. Specifically, Sherman asserted that Rinchem failed to provide him with Inman's April 18, 2008 interview notes. The district court denied Sherman's summary-judgment motion and granted Rinchem's summary-judgment motion as to all claims.

## II. *Discussion*

On appeal, Sherman argues that the district court (1) abused its discretion in denying his motion for summary judgment or, in the alternative, requiring an adverse-inference instruction against Rinchem as a sanction for spoliation of evidence and (2) erred in granting summary judgment to Rinchem on his defamation claim.[3]

## A. *Spoliation of Evidence*

In seeking summary judgment as a sanction for spoliation of evidence, Sherman argued that he had specifically requested that Rinchem produce "[a]ny and all documents relating to Plaintiff and the investigation of the Plaintiff conducted by Human Resources at Rinchem." According to Sherman, Rinchem failed to provide him with interview notes that Inman took during their April 18, 2008 meeting. Sherman asserted that these "notes [were] extremely critical to the case because they were taken shortly after the accusations and would be extremely relevant because [Inman] was discussing the Plaintiff's termination and what was in fact discussed." Based on Rinchem's alleged misconduct, Sherman contended that the district court should grant his motion for summary judgment or, in the alternative, give an adverse-

---

[3]Sherman has not appealed the district court's grant of summary judgment on his other claims.

inference instruction to the jury for spoliation of evidence. Sherman's argument relied on the application of Minnesota law.

At the motions hearing, the district court applied federal law, which requires "a finding of bad faith in order to impose the sanctions of summary judgment or an adverse inference instruction." Based on the record, the district court found no "evidence of bad faith intentional destruction" because Inman's testimony was that she "lost" the notes, not that she "destroy[ed] the notes." The court concluded that this act was at most "negligent," not intentional. The court asked Sherman what remedies he sought if it concluded that "negligent spoliation" occurred, stating, "[I]s there some remedy I could give you if I were to find spoliation short of summary judgment or an adverse inference instruction?" In response to the court's question, Sherman's counsel stated:

> The Court's point is well-taken. *I concur that, based on the record that we have, that it was non-intentional and that it was negligent in nature based on Ms. Inman's deposition that I took.*
>
> I think the remedy that we would ask the Court for, in the event that this matter proceeds to trial, would be a motion in limine and that is to exclude in part or in whole the testimony of Ms. Inman. Now, I'm not sure how that would actually proceed, but that it would be some kind of in limine testimony, in limine order related to her testimony.

(Emphasis added.) Thereafter, the district court denied the motion for summary judgment for spoliation of evidence without prejudice, explaining:

> I think what I will do, Mr. Villaume, is I think I'm just going to deny your motion without prejudice. The basis is your motion asks for summary judgment or an adverse inference instruction. Rightly or wrongly, as I understand Eighth Circuit law binding on me, I can't give you either remedy outside of a finding of bad faith. *You've candidly admitted that I can't really make a finding of bad faith on this record.*

-10-

That doesn't foreclose you from coming back to me if we try this case and asking for some—as part of our motions in limine, which I'd hear before trial, asking for some remedies short of judgment or an adverse inference instruction. And I will give you—I know it's a lot to foist on you just standing at the podium, but I will give you a chance to think about that. If you want me to revisit the issue, you can bring it as a motion in limine. Let's do it that way.

(Emphasis added.) Shortly after the hearing, the court entered an order denying Sherman's summary judgment motion without prejudice.

On appeal, Sherman argues that the district court erroneously applied federal law relating to spoliation of evidence instead of Minnesota law, which only requires that he show that Rinchem was negligent in failing to retain Inman's notes. Sherman contends that because Rinchem negligently destroyed the notes, either summary judgment or an adverse-inference instruction is an appropriate sanction.

We review for an abuse of discretion "a district court's imposition of sanctions under its inherent power." *Stevenson v. Union Pac. R.R. Co.*, 354 F.3d 739, 745 (8th Cir. 2004) (quotation, alteration, and citation omitted). "A court's inherent power includes the discretionary ability to fashion an appropriate sanction for conduct which abuses the judicial process." *Id.* (quotation and citation omitted).

Under federal law, "there must be a finding of *intentional destruction* indicating a desire to suppress the truth." *Id.* at 746 (emphasis added) (citing, *inter alia*, *Lewy v. Remington Arms Co.*, 836 F.2d 1104, 1111–12 (8th Cir. 1988) (citing federal law for the general proposition that the adverse inference instruction is appropriate only where the spoliation or destruction of evidence is intentional and indicates a fraud or desire to suppress the truth)). By contrast, Minnesota law provides that "*even when a breach of the duty to preserve evidence is not done in bad faith*, the district court must attempt

-11-

to remedy any prejudice that occurs as a result of the destruction of the evidence." *Miller v. Lankow*, 801 N.W.2d 120, 128 (Minn. 2011) (emphasis added).

Thus far, we have declined to determine whether federal or state law applies to motions for sanctions based on spoliation of evidence in diversity cases where no conflict existed between the state and federal law. *See, e.g.*, *Menz v. New Holland N. Am., Inc.*, 440 F.3d 1002, 1006 (8th Cir. 2006) ("We need not decide whether federal or state law governs in this diversity action because the result is the same under both—to warrant dismissal as a sanction for spoliation of evidence there must be a finding of intentional destruction indicating a desire to suppress the truth." (quotation and citation omitted)). But, in the present case, because a direct conflict exists between federal law and Minnesota law, we must resolve the issue.

We now hold, in accordance with our sister circuits, that federal law applies to the imposition of sanctions for the spoliation of evidence. *See, e.g.*, *Adkins v. Wolever*, 554 F.3d 650, 652 (6th Cir. 2009) (citing *Silvestri v. Gen. Motors Corp.*, 271 F.3d 583, 590 (4th Cir. 2001); *Reilly v. Natwest Mkts. Grp. Inc.*, 181 F.3d 253, 267 (2d Cir. 1999); *Glover v. BIC Corp.*, 6 F.3d 1318, 1329 (9th Cir. 1993)); *Condrey v. SunTrust Bank of Ga.*, 431 F.3d 191, 203 (5th Cir. 2005) ("[F]ederal courts . . . apply federal evidentiary rules rather than state spoliation laws in diversity suits."); *Flury v. Daimler Chrysler Corp.*, 427 F.3d 939, 944 (11th Cir. 2005) ("We agree with the first view, that federal law governs the imposition of spoliation sanctions. Furthermore, in accordance with the fourth and fifth circuits, we conclude that federal law applies because spoliation sanctions constitute an evidentiary matter.").

> We believe that this is the correct view for two reasons. First, the authority to impose sanctions for spoliated evidence arises not from substantive law but, rather, "from a court's inherent power to control the judicial process." *Silvestri*, 271 F.3d at 590 (citing *Chambers v. NASCO, Inc.*, 501 U.S. 32, 45–46, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991)). Second, a spoliation ruling is evidentiary in nature and federal courts

-12-

generally apply their own evidentiary rules in both federal question and diversity matters. *King v. Ill. Cent. R.R.*, 337 F.3d 550, 556 (5th Cir. 2003). These reasons persuade us now to acknowledge the district court's broad discretion in crafting a proper sanction for spoliation.

*Adkins*, 554 F.3d at 652.

Sherman argues that even if federal law applies, the district court abused its discretion by denying a sanction for spoliation of evidence. Sherman contends that Rinchem received notice early in the dispute that Sherman would file suit for defamation and still failed to preserve all relevant evidence, including Inman's notes. Sherman asserts that because Rinchem destroyed relevant evidence, it acted in bad faith.

But, based our review of the record, we conclude that Sherman *conceded* before the district court that Rinchem *did not* intentionally or in bad faith destroy the notes. Specifically, Sherman's counsel stated, "I concur that, based on the record that we have, that it was *non-intentional* and that it was *negligent in nature* based on Ms. Inman's deposition that I took." (Emphases added.) Thereafter, the district court confirmed the concession of Sherman's counsel, stating, "You've candidly admitted that I can't really make a finding of bad faith on this record." Therefore, we hold that the district court did not abuse its discretion in denying Sherman's motion for summary judgment based on spoliation of evidence or, in the alternative, an adverse-inference instruction.

B. *Defamation*

Sherman argues that the district court erroneously granted summary judgment to Rinchem because genuine issues of material fact exist as to his defamation claim. According to Sherman, Inman's "'confused testimony'" about the exact date that she decided to terminate Sherman—April 20 or April 21, 2008—"'might give a jury reason to doubt that Inman's real reason for firing Sherman was the alleged lie that he

told about the restraining orders.'" (Quoting *Sherman*, 2011 WL 3471057, at \*11.) Sherman asserts that this "confused testimony" creates genuine issues of material fact; therefore, Sherman argues that Rinchem should not receive a qualified privilege. Sherman maintains that he created genuine issues of material fact regarding whether Rinchem acted with malice when Inman stated that Sherman lied.

In response, Rinchem argues that the district court correctly held that Rinchem's communication was subject to a qualified privilege and that, as a matter of law, there was no malice. Rinchem also asserts that the district court correctly determined that Sherman failed to present sufficient evidence to support a claim of compelled self-publication where he did not identify to whom, when, and under what circumstances he was compelled to disclose the reason for his termination. Additionally, Rinchem argues that the district court should have granted summary judgment to Rinchem because its statements were true.

"We review a district court's grant of summary judgment de novo." *Hankins v. Standard Ins. Co.*, 677 F.3d 830, 834 (8th Cir. 2012).

> Defamation under Minnesota law requires proof that the alleged defamatory statement (1) was communicated to someone other than the plaintiff, (2) was false, and (3) tended to harm the plaintiff's reputation and lower h[im] in the estimation of the community. *Bahr v. Boise Cascade Corp.*, 766 N.W.2d 910, 919–20 (Minn.2009). Whether a communication is actionable because it contained a provably false statement of fact is a question of law. *McClure v. Am. Family Mut. Ins. Co.*, 223 F.3d 845, 853 (8th Cir.2000), citing *Geraci v. Eckankar*, 526 N.W.2d 391, 397 (Minn.App.), *review denied*, (Minn. Mar. 14), *cert. denied*, 516 U.S. 818, 116 S.Ct. 75, 133 L.Ed.2d 34 (1995).

*Chambers v. Travelers Cos.,* 668 F.3d 559, 564 (8th Cir. 2012).

Before the district court, Rinchem asserted that summary judgment in its favor was appropriate on Sherman's defamation claim "because its assertion that Sherman lied to Inman was protected by a qualified privilege." *Sherman*, 2011 WL 3471057, at *9. The district court agreed, concluding that "even if Inman's statement that Sherman had lied about the restraining orders was false, that statement was protected by a qualified privilege." *Id.* at *12. Additionally, the court found that Sherman failed to prove that Rinchem abused such privilege because no reasonable jury could "find that Inman acted with malice in [stating that Sherman lied about the restraining orders]." *Id.*

Under Minnesota law, "[o]ne who makes a defamatory statement will not be held liable if the statement is published under circumstances that make it qualifiedly privileged and if the privilege is not abused." *Bol v. Cole*, 561 N.W.2d 143, 149 (Minn. 1997). Minnesota courts apply qualified privilege when "statements made in particular contexts or on certain occasions should be encouraged despite the risk that the statements might be defamatory." *Id.* (quotation and citation omitted).

> This qualified privilege analysis encompasses a two-step approach to determining whether the privilege applies. First, to establish the existence of the privilege, the defendant bears the burden of proving the communication was: (1) made upon a proper occasion, (2) made from a proper purpose, and (3) based upon reasonable and probable grounds. Whether the employer had a proper purpose and whether the employer had a proper occasion in making a communication are always questions of law for the court to decide. Whether the employer had reasonable and probable grounds for making the statement is also generally a question of law for the court, unless the evidence permits of more than one conclusion, when the question becomes one of fact for the jury.

*Keenan v. Computer Assocs. Int'l, Inc.*, 13 F.3d 1266, 1269–70 (8th Cir. 1994) (quotations and citations omitted).

-15-

"Statements made 'in the course of investigating or punishing employee misconduct' are generally privileged, based on the employer's interest in protecting against harmful employees." *Rudebeck v. Paulson*, 612 N.W.2d 450, 453 (Minn. Ct. App. 2000) (quoting *McBride v. Sears, Roebuck & Co.*, 235 N.W.2d 371, 374 (Minn. 1975)). "Communications between an employer's agents made in the course of investigating or punishing employee misconduct are made upon a *proper occasion* and for *a proper purpose*, as the employer has an important interest in protecting itself and the public against dishonest or otherwise harmful employees." *McBride*, 235 N.W.2d at 374 (emphases added). Likewise, "an employer's communication to an employee of the reason for discharge may present a *proper occasion* upon which to recognize a qualified privilege." *Lewis v. Equitable Life Assurance Soc'y of the U.S.*, 389 N.W.2d 876, 890 (Minn. 1986) (emphasis added). And, "[i]n the context of employment recommendations, the law generally recognizes a qualified privilege between former and prospective employers as long as the statements are made in good faith and for a legitimate purpose." *Id*. at 889.

Here, we agree with the district court that "Rinchem's statement, originally made in Sherman's termination memorandum and later repeated by Sherman in job interviews, is exactly the type of statement that the qualified privilege is meant to protect." *Sherman*, 2011 WL 3471057, at *9. Rinchem—the employer—made the statement to Sherman—the employee—to communicate *why* it was terminating Sherman. Under Minnesota law, this is a proper occasion and purpose. *See Lewis*, 389 N.W.2d at 890.

Rinchem must also show that "the communication was . . . based upon reasonable and probable grounds" to establish that a qualified privilege applies. *Keenan*, 13 F.3d at 1269. "Reasonable grounds can exist if a person has valid reasons for believing a statement, even though the statement later proves to be false." *Rudebeck*, 612 N.W.2d at 454 (quotation and citation omitted). Courts inquire as to "whether the employer took investigative steps" in deciding "whether the statements

were supported by reasonable or probable cause." *Id*. This means that "the court will examine the precise nature and extent of the investigation to assess the facts supporting the defamatory allegations and the efforts the employer made to ascertain their accuracy." *Id*.

Like the district court, we conclude that Rinchem satisfied its burden of proving that "the communication was . . . based upon reasonable and probable grounds." *Keenan*, 13 F.3d at 1269. Rinchem learned of the additional restraining order during the course of a thorough investigation. The undisputed evidence shows that Budlong interviewed several of Sherman's coworkers over a five-day period. During these interviews, several coworkers informed Budlong about the restraining order that Hansen—i.e., "the lady at the lake"—had obtained. "Nothing in the record suggests that it was unreasonable for Inman to rely on those accounts of Sherman's coworkers." *Sherman*, 2011 WL 3471057, at *9. Therefore, we, like the district court, find that "the reports of Sherman's coworkers provided probable cause for Rinchem to conclude that Sherman lied to Inman when he told her that the only restraining orders that had been issued against him were the orders obtained by his ex-wife and her husband." *Id*. As a result, Rinchem has satisfied its burden of proving that the qualified privilege applies.

Because Rinchem "has established the existence of the qualified privilege, the burden shifts to [Sherman] to prove that [Rinchem] abused that privilege by actual malice." *Keenan*, 13 F.3d at 1270. "Malice is generally a question of fact." *Bol*, 561 N.W.2d at 150. But "[o]n review of summary judgment, . . . this court determines whether the evidence submitted raises any genuine issues of material fact." *Id*. "[A]ctual malice . . . is defined in Minnesota law as 'actual ill will, or a design causelessly and wantonly to injure plaintiff.'" *Frankson v. Design Space Int'l*, 394 N.W.2d 140, 144 (Minn. 1986) (quoting *McBride*, 235 N.W.2d at 375). The Minnesota Supreme Court has previously "sustained a finding of malice when '[t]here was some evidence from which it might be inferred that the defendant knew of the

-17-

falsity of some of the statements [and] . . . also some evidence of ill feeling between [defendant's employee] and plaintiff.'" *Id.* (alterations in original) (quoting *Froslee v. Lund's State Bank*, 155 N.W. 619, 620 (Minn. 1915)). A plaintiff may prove malice "by extrinsic evidence of personal ill feeling, or by intrinsic evidence such as the exaggerated language of the libel, the character of the language used, the mode and extent of publication, and other matters in excess of the privilege." *Id.* (quotation and citation omitted).

In the present case, Sherman has presented no evidence that Rinchem *knew* that the statement was false. As explained *supra*, several of Sherman's coworkers told Budlong that Sherman discussed Hansen's restraining order against him. Nor has Sherman presented any intrinsic evidence of malice. As the district court observed, "[n]othing about the language of the April 21 memorandum is exaggerated or otherwise reflective of ill will, and the only 'publication' *by Rinchem* of the memorandum occurred in a private meeting between Sherman and Rinchem officials." *Sherman*, 2011 WL 3471057, at *10 (emphasis added).

Likewise, Sherman has provided no extrinsic evidence of malice. The record is devoid of evidence that Inman had any "personal ill feeling" toward Sherman. As the district court noted, Inman and Sherman did not work in the same state and had met only once. *See id.* Sherman has produced no evidence that Inman was anything but "calm, polite, and professional" in her dealings with him. *Id.* On appeal, the only purported extrinsic evidence of malice that Sherman presents is Inman's testimony about *when* she decided to fire Sherman—April 20 or April 21, 2008. Inman testified that she made "a final determination" to terminate Sherman on Sunday, April 20. But she also testified that she continued the investigation and interviewed Sherman on Monday, April 21 to ensure that she had "ma[d]e the right decision" and to "check[] [herself]." After the April 21 interview, Inman drafted the employee-counseling memo terminating Sherman's employment. According to Sherman, if a jury concludes that Inman decided to fire him on Sunday, April 20—prior to interviewing him about the

-18-

restraining orders on Monday, April 21—it could find that Inman did not really fire him for lying about the restraining orders as she claimed in the April 21 employee-counseling memo. Sherman asserts that these facts support the conclusion that Inman did not complete her investigation prior to making her decision to terminate Sherman, thus showing that she harbored an improper motive or acted carelessly and wantonly for the purpose of injuring Sherman.

But "[w]hen the only evidence presented of actual malice is that it was an *alternative reason* for the defendant's action, *see, e.g., Frankson*, 394 N.W.2d at 144–45, and there is 'direct evidence' that probable cause existed for the action taken, *id.* at 145, no jury question exists with respect to actual malice." *El Deeb v. Univ. of Minn.*, 60 F.3d 423, 427 (8th Cir. 1995) (emphasis added) (applying Minnesota law). Even if Inman's testimony that she "made a final determination" to terminate Sherman on April 20 establishes that she had an alternative reason for firing Sherman—including a discriminatory one—no jury question exists as to actual malice because "there is 'direct evidence' that probable cause existed for the action taken," *id.* "Despite the gnawing frustration [Sherman] may feel because a false reason for his discharge exists in his personnel file, the matter of defamation in total should not [be] submitted to the jury. The evidence [is] insufficient for a finding of malice." *Frankson*, 394 N.W.2d at 145.

Therefore, assuming, without deciding, "that the alleged defamatory statement (1) was communicated to someone other than [Sherman], (2) was false, and (3) tended to harm [Sherman's] reputation and lower [him] in the estimation in the community," Rinchem is "entitled to a qualified privilege that defeats the defamation claim." *Chambers*, 668 F.3d at 564.

### III. *Conclusion*

Accordingly, we affirm the judgment of the district court.

_____

-19-