REESE DESIGN, INC., Appellant,

v.

I-94 HIGHWAY 61 EASTVIEW CENTER PARTNERSHIP, et al., Respondents.

No. C8-87-2392.

Court of Appeals of Minnesota.

Aug. 23, 1988.

Douglas P. Kempf, Kempf & Kempf, Bloomington, for appellant.

Timothy J. Hassett, Peterson, Franke & Riach, P.A., Roseville, for respondents.

Heard, considered and decided by FOLEY, P.J., and SCHUMACHER and THOREEN,* JJ.

## OPINION

FOLEY, Judge.

This is an appeal from an order for judgment denying the claim of appellant Reese Design, Inc. for fees due pursuant to a contract with a developer. Reese asserts that it was authorized to prepare final plans and specifications and should be paid for services rendered, and further that it is entitled to relief on the basis of the doctrine of account stated due to the failure of respondent CHK Partnership to object to the billings.

The trial court found that Reese was not authorized to prepare final plans and specifications, that the doctrine of account stated was not pleaded and that it did not apply to the facts of this case and that CHK objected to the billings. We affirm in part, reverse in part and remand for amended judgment.

## FACTS

This appeal involves a dispute between an architectural firm, Reese, and a general partnership, CHK, as to whether architectural and engineering fees are due pursuant to a June 17, 1983 contract entered into with a developer. The entire contract consisted of a three-paragraph letter drafted by Reese. The terms of the contract were ambiguous and are now subject to interpretation. It is long understood a writing that

is vague or ambiguous must be construed against the drafter.

The central issue at trial was whether Reese was authorized to begin work on the final phase of the project. The trial court held that there was no such authorization. Reese argues on appeal that the findings of the trial court are clearly erroneous.

Reese's own expert witness, David Anderson, President of the Minneapolis Chapter of the American Institute of Architects, testified that the AIA discourages the use of letter agreements; that the terms "preliminary" and "final" are subject to individual interpretation; that the agreement drafted by Reese does not meet the AIA minimum statement of services to be included in letter agreements; and that unless services and compensation are fully defined in a letter agreement, the agreement can become burdensome to both parties as the project progresses.

The preliminary phase of the project had an estimated cost of $12,000 and the final design phase $116,000. A second letter from Reese clarified that the *estimated fees* of $12,000 and $116,000 contained in the contract *are maximums*. A third letter from Reese stated that the payment for services in the preliminary phase was expected around October 1, 1983 and that it was willing to wait until November 1, 1983 before charging interest on that amount. Reese was paid $12,000 on or about November 1, 1983.

Reese mailed bills to CHK on a monthly basis. CHK admits receiving these monthly bills but contends that the agreement called for a "lump sum" payment, and that it considered the monthly bills simply a means for Reese to accomplish its accounting. CHK did not protest many of these billings because of this anticipated lump sum payment, but it did protest the billings after it realized Reese had exceeded its authorized fees.

CHK was in the process of obtaining FHA financing. The FHA application process outlines how design and construction are allowed to proceed, and which steps

---

* Acting as judge of the court of appeals by appointment pursuant to Minn. Const. art. 6, § 2.

must be taken in order to proceed into the next phase. Reese had been involved with many other FHA projects and knew of the requirements necessary to complete before moving on to another stage.

In August 1983 the developers began discussions with Lynn Burton of Northland Mortgage to see if they could obtain FHA insurance for their project. The FHA application process involves three stages: (1) site and market analysis stage; (2) conditional commitment stage; and (3) firm commitment stage. At each stage, architectural drawings are required. At the site and market analysis stage, the requirement is minimal. At the conditional commitment stage, more extensive "schematic" drawings are required. At the firm commitment stage, detailed final plans and specifications are required.

CHK did not make application for a conditional commitment. Had it done so, an FHA staff architect would have been appointed to review the architectural documents. This review is one of the major purposes of the conditional commitment stage. An architect typically needs anywhere from 30 to 60 days to address the comments made by the FHA staff architect. The FHA will not accept a project unless the changes the FHA staff architect requests are either made or successfully negotiated between the architect, the borrower, the FHA architect and the FHA underwriter.

Reese testified that work began on final plans and specifications on September 15, 1983 and that it was aware that the FHA architect's comments must be incorporated into the final plans. Reese testified that it was not sure whether or not an FHA architect was appointed for this project, even though it was Reese's job to work with the FHA architect. The fact is that no FHA architect was appointed, and there was no review of Reese's plans.

An "intake" meeting took place between the FHA and the developer on September 20, 1983. Reese attended. Burton testified that she was "extremely discouraged" about the project after this meeting, and that given questions about the project's feasibility, she could not recommend making a conditional commitment application.

At the end of September or the beginning of October 1983, CHK received a telephone call from Reese. One of the partners of CHK, respondent Karl Keller, testified that he had been bugging another partner, respondent Donald Christenson, to get a *cost estimate* for the project. Reese told Keller that it needed $20,000 to supply Christenson with the plans needed to get a cost estimate. Keller discussed the matter with Christenson and agreed to spend the additional $20,000.

Reese denies that this agreement was reached. However, Reese testified that Keller authorized it to prepare "design development" plans. Design development plans are very detailed and involve the mechanical, electrical, structural and landscaping aspects of the development, according to Anderson.

CHK paid Reese $12,000 on or about November 1, 1983 and $10,000 on or about April 24, 1984. The April 24, 1984 payment was accompanied by a note which promised "further payments on account whenever possible." Keller testified that the reference to "further payments" is a reference to part of the additional $20,000 that CHK promised to pay Reese.

Keller testified that he called Reese in December 1983 and told him to cease all work. Reese testified that Keller asked him to cease all work in January 1984.

Prior to this, Reese maintains that it was fully authorized to prepare final plans and specifications. However, Reese admitted that there was no formal authorization to prepare final plans and specifications. Reese contends that it was given authorization by the receipt of an FHA checklist from one of the partners of CHK, respondent Harry Hadd. Hadd testified that he had never authorized Reese to prepare final plans and specifications.

The second event which Reese considered authorization was a conversation with Christenson during September 1983. At that time, Christenson said he wanted some plans to take to the city for initial review

for a building permit, according to Reese. Frank Reese later testified he could not remember whether the authorization came as a result of a meeting or a phone call. If it was a meeting, he said he could not recall who else was present. He also admitted that in his deposition he had testified that he used Christenson's name to represent Hadd, Keller or Christenson, "not knowing which in particular I was dealing with."

After this lawsuit was commenced, Reese asked Christenson to sign the following statement:

> June 2, 1986
>
> It was my understanding that Reese Design, Inc. was providing final architectural and engineering plans for the Fountain Place apartment project for CHK, a general partnership.
>
> _____
>
> Don Christenson

Christenson refused to sign.

The trial court found that Reese's claims of authorization were not credible, given the fact that no architectural documents were submitted by Reese, no conditional commitment application was made, no FHA architectural representative was appointed and there was no review or comment upon the plans and specifications. The trial court noted that Reese, "being an experienced architectural firm, was aware all of these steps were required for preparation of final plans and specifications."

The trial court stated that Reese's testimony regarding Christenson does not demonstrate authorization was given and noted that Reese could not recall whether it was Christenson, Hadd or Keller that he was dealing with at the time. The trial court also stated that Reese's claim of authorization from receipt of an FHA checklist was not credible. The trial court said that the checklist conflicts with Reese's experience in 20 prior FHA projects and noted that Hadd testified that he had never seen the document prior to trial.

## ISSUES

1. Are the trial court's findings of fact clearly erroneous?

2. Did Reese plead the doctrine of account stated, and if not, was the issue tried by consent?

3. Can Reese recover under an implied contract theory which was first raised after trial?

## ANALYSIS

1. The standard of review of a trial court's findings of fact is the "clearly erroneous" test. *Vanderweyst v. Langford,* 303 Minn. 575, 228 N.W.2d 271 (1975); Minn.R.Civ.P. 52.01. Further, findings of fact by the trial court can be set aside as clearly erroneous only if the appellate court is left with a definite and firm conviction that a mistake has been made. *City of Minnetonka v. Carlson,* 298 N.W.2d 763 (Minn.1980). Here, we are not so persuaded.

■ Reese asserts the trial court was clearly erroneous by failing to apply the doctrine of accounts stated to the facts of this case and in finding CHK objected to Reese's billings. To establish an account stated, Reese must prove that CHK kept Reese's invoices for an unreasonable period of time without objection. *American Druggists Insurance v. Thompson Lumber Co.,* 349 N.W.2d 569 (Minn.Ct.App. 1984).

■ The trial court considered and rejected Reese's claim of an account stated. The trial court's findings in this regard are as follows:

> 16. Plaintiff twice amended its Complaint but on neither occasion included the Account Stated Doctrine as a theory of recovery. Plaintiff did not seek to amend the Complaint prior to a trial to advance this theory so the claim should not be considered herein. However, the Court finds that the Account Stated Doctrine is inapplicable to these facts for the following reasons:
>
> a. Plaintiff testified that payment was not expected on a monthly basis, but, rather, in a lump sum on November 1, 1983.
>
> b. Payment was, in fact, received on or about November 1, 1983. Therefore,

the use of the monthly statements from June 1983 through November, 1983 is inappropriate as a basis for the Account Stated Doctrine;

■ Reese argues that the trial court erred in not applying the doctrine of account stated. Existence of account stated requires "mutual examination of the claims of each other by the parties" and "mutual agreement between them, as to the correctness of the allowance and disallowance of the respective claims, and of the balance." *Roehrdanz v. Schlink,* 368 N.W.2d 409, 412 (Minn.Ct.App.1985). The record indicates there was an agreement made to pay for the preliminary phase of the project in a lump sum payment to be due on or about November 1, 1983. There was no arrangement made for monthly payments.

Reese asserts the trial court erred by finding that CHK objected to the billings. The trial court found in paragraph 16c the following:

> There is evidence that CHK protested the billings. Karl Keller testified that in December, 1983, he told Plaintiff to stop all work and all further billings;

The trial court's finding that there is evidence of protest by CHK is supported by the record. The record contains testimony by Reese that he admitted Keller had phoned him and told him to stop all work and all billings, and also testimony by Keller that in December 1983 it came to his attention the bill was in excess of $32,000, and he had a conversation with Reese and told Reese to stop all work on the project until they had clarified their situation.

■ The evidence which consists almost entirely of oral testimony will be disturbed on appeal only in the most unusual circumstances. *Fidelity Bank and Trust Co. v. Fitzimons,* 261 N.W.2d 586, 589 (Minn. 1977), *citing Orvis v. Higgins,* 180 F.2d 537, 539 (2nd Cir.1950); *Berry v. Goetz,* 348 N.W.2d 376, 378 (Minn.Ct.App.1984). We find no such unusual circumstances here.

These factual findings of the trial court are supported by the record. Reese was not authorized to prepare final plans and specifications, the doctrine of account stated is inapplicable to these facts and CHK did protest the billings.

We hold, however, that the findings of fact by the trial court are incomplete. At oral argument, CHK conceded that it still owes a remaining balance of $10,000. Its obligation to Reese was $12,000 for the preliminary plans and $20,000 for the design development plans. It had paid a total of $22,000. CHK asserted that it had not paid the $10,000 because of the pending appeal.

Because of this admission, we hold that the judgment of the trial court must be amended to require CHK to pay the remaining amount due on its account, plus interest. Since the parties did not agree to place the debt obligation on "hold" pending appeal, Reese was entitled to receive the payment that was due for services rendered and should not have been forced to wait until after the appeal was over to receive the sum due and owing and now conceded on appeal remaining to be paid.

■ 2. The trial court found that Reese did not plead the doctrine of account stated in its initial complaint, its first amended complaint or its second amended complaint. Reese did not seek to amend its complaint prior to, during or after the trial. As a result, Reese is not entitled to recover under a theory which it did not plead unless the issue was voluntarily litigated. *Roberge v. Cambridge Cooperative Creamery Co.,* 243 Minn. 230, 67 N.W.2d 400 (1954).

■ Consent to try issues outside the pleadings will not be implied merely because defendant failed to claim surprise or ask for a continuance, but where there is no amendment of the pleadings, it is sufficient that timely objection be made. *Id.* at 235–36, 67 N.W.2d at 404.

The only time that Reese raised the doctrine of account stated was in its opening argument. The trial court responded by asking for memoranda on the issue. In its memorandum, CHK objected to Reese's use of the doctrine, pointing out that the doctrine was not included in any of Reese's pleadings. This objection was timely made,

given that this was the first opportunity that CHK's counsel had to research the applicability of the doctrine.

In addition, the trial court found that even considering the doctrine of account stated was not pleaded, it still does not apply to the facts of this case. We agree.

■ 3. As a general rule, litigants are bound by the theory or theories upon which the action was actually tried in the trial court. *Annis v. Annis*, 250 Minn. 256, 84 N.W.2d 256 (1957). Reese cannot genuinely urge reversal of the trial court and the entry of a $117,059 judgment in its favor based upon a legal theory that was never litigated. *Winter v. Farmers Educational & Cooperative Union*, 259 Minn. 257, 107 N.W.2d 226 (1961). Reese cannot argue that the trial court erred by failing to consider an issue that it chose not to litigate. *Id.* at 268, 107 N.W.2d at 234.

■ Reese's theory of implied contract is inapplicable to the facts of this case. There is a written contract between Reese and CHK. Where an express contract exists, there can be no implied contract with respect to the same subject matter. *Schimmelpfennig v. Gaedke*, 223 Minn. 542, 27 N.W.2d 416 (1947). Parties to an express contract are entitled to have their rights and obligations determined exclusively by its terms. *Id.* at 548, 27 N.W. 2d at 421.

■ The legal theory of implied contract was not litigated and will not be considered on appeal. An express contract exists between the parties. Therefore, no contract can be implied.

## DECISION

We affirm in part, reverse in part and remand for amended judgment in Reese's favor in the amount of $10,000 together with interest from April 24, 1984 and costs.

AFFIRMED IN PART, REVERSED IN PART AND REMANDED.