**STATE OF MINNESOTA
IN COURT OF APPEALS
A14-1159**

Toyota-Lift of Minnesota, Inc.,
Respondent,

vs.

American Warehouse Systems, LLC, et al.,
defendants and third party plaintiffs,
Appellants,

vs.

Les Nielsen,
third party defendant,
Respondent.

**Filed July 13, 2015
Affirmed in part, reversed in part, and remanded
Cleary, Chief Judge**

Hennepin County District Court
File No. 27-CV-12-9725

Paul W. Chamberlain, Ryan R. Kuhlmann, Chamberlain Law Firm, Wayzata, Minnesota (for respondents)

Jeffrey R. Underhill, Ryan R. Dreyer, Stacy L. Kabele, Morrison Sund PLLC, Minnetonka, Minnesota (for appellants)

Considered and decided by Ross, Presiding Judge; Cleary, Chief Judge; and Johnson, Judge.

## S Y L L A B U S

To calculate whether the employee "recovers a greater sum than the amount []
tendered [in good faith]," within the meaning of Minn. Stat. § 181.14, subd. 3 (2014), a
court should compare only (1) the amount of wages and commissions that the employer
tendered in good faith and (2) the amount of wages and commissions the court found that
an employee was actually due pursuant to a claim under Minn. Stat. § 181.14, subd. 1
(2014).  If the amount due is greater than the amount tendered, then the employer remains
liable for penalties under Minn. Stat. § 181.14, subd. 2 (2014).

## O P I N I O N

**CLEARY**, Chief Judge

Appellants American Warehouse Systems, LLC (AWS), Mark Juelich, Steven
Thoemke, and EMESCO, LLC challenge the district court's order denying their post-trial
motions to amend findings and conclusions of law.  Appellants argue that the district
court erred by (1) using parol evidence to interpret the asset-purchase agreement between
AWS and respondent; (2) failing to award penalties under Minn. Stat. § 181.14, subd. 2
for the late payment of 2009 commissions; and (3) overturning its earlier injunction
against respondent's use of customer lists.  Respondent and cross-appellant Toyota-Lift
of Minnesota, Inc. (TLM) argues that the district court erred by concluding that
(1) appellants Juelich and Thoemke were due additional commission payments; and
(2) TLM did not have a claim for conversion against AWS.  While we affirm most of the
district court's findings and conclusions of law, we conclude that the district court

2

misapplied Minn. Stat. § 181.14, so we affirm in part, reverse in part, and remand for further proceedings.

**FACTS**

TLM is a dealership that sells forklifts and allied products. In 2003, TLM hired appellants Juelich and Thoemke to work in the allied products division of TLM. Thoemke was hired as a salesman and Juelich was hired as both manager and salesman. Juelich and Thoemke earned commissions as compensation for their sales. Until September 2009, Juelich and Thoemke earned a commission of 40% of the gross margin for each sale.

Because TLM was dissatisfied with the allied products division's profits, TLM instituted a new compensation policy in September 2009. Under the new policy, salespeople earned a base commission rate of 30% of gross margins, but they could increase their commissions to 40% or 50% of gross margins if the allied products division's "bottom line" reached 3% or 4%. The document outlining the new compensation policy did not explain how the "bottom line" would be calculated.

After TLM's 2009 fiscal year ended, a preliminary profit-and-loss report showed the allied products division's net operating profit as 5%. In July or August 2010, however, respondent Nielsen, the president of TLM, informed Juelich that he and Thoemke would not receive additional 2009 commissions because the preliminary profit-and-loss statement did not reflect several "year-end adjustments." The final profit-and-

3

loss statement, published in November 2010, showed the allied products division's net operating profit as only 1.5%.

On January 11, 2011, Juelich presented Nielsen with a letter of intent to purchase the allied products division. On April 1, 2011, the parties finalized an asset-purchase agreement (APA) in which a new entity, AWS, would purchase the assets of TLM's allied products division. Several portions of the APA discuss rights to payment. Section 1.1.2 discusses receivables arising from "works in progress." Section 7.2 of the APA instructs that "[i]f a Party receives any payment that should have been directed to the other Party's [sic] after the Closing they agree to forward such payment to the other Party as soon as possible." Section 10.15 states "Any amount owed by a Party to the other Party . . . may be offset and applied to satisfy any obligation of such Party to the other Party." Exhibit 2.5a discusses how net profits on works in progress are to be divided between TLM and AWS.

From April to June 2011, AWS remitted payments for works in progress to TLM. In July 2011, counsel for appellants sent a letter to TLM alleging that TLM had breached the APA. In relevant part, this letter (1) alleged that TLM owed Juelich and Thoemke additional 2009 commissions; (2) stated that AWS would account for these additional commissions by exercising its offset rights in section 10.15 of the APA; and (3) alleged that TLM had breached the APA by failing to purge customer lists from TLM's computer system. In August, September, and October 2011, counsel for appellants sent TLM three more letters regarding the 2009 commissions.

4

In April 2012, TLM filed a complaint against AWS and Juelich. The complaint alleged breach of contract, conversion, and unjust enrichment, all on the theory that AWS retained payments that TLM expected to be remitted to TLM. AWS and Juelich maintained that they had acted within the scope of their rights under the APA. They made several counterclaims, including claims of breach of contract, a request for accounting for 2009 commission payments, and requests for injunctive relief. Thoemke and EMESCO, LLC,[1] later joined the suit.

Prior to trial, AWS and Juelich filed a motion in limine to prevent the district court from considering parol evidence to interpret the APA. The district court concluded, however, that the APA is ambiguous. The court therefore considered parol evidence to interpret the APA, concluding that the APA did not transfer all receivables on works in progress to AWS. Additionally, in relevant part, the district court (1) concluded that AWS had breached the APA by retaining payments owed to TLM; (2) dismissed TLM's conversion claim against AWS because TLM's claims arose under the APA; (3) found that TLM owed additional 2009 commissions to Juelich and Thoemke; (4) denied Juelich and Thoemke penalties under Minn. Stat. § 181.14 for TLM's late payment of commissions; and (5) enjoined TLM from marketing to customers on the customer lists that TLM sold to AWS.

---

[1] EMESCO, LLC, is an entity composed of Juelich and Thoemke, which has an interest in Juelich and Thoemke's rights to 2009 commission payments and an 80% controlling interest in AWS.

Appellants and TLM filed post-trial motions, and the district court conducted a hearing on those motions. In relevant part, the court's May 2014 order lifted the customer-list injunction and denied TLM's motion to find that Juelich and Thoemke were not entitled to additional 2009 commissions. This appeal followed.

## ISSUES

I.  Did the district court err by concluding the APA is ambiguous?

II. Did the district court err by concluding TLM did not have a claim for conversion against AWS?

III. Did the district court abuse its discretion by lifting its injunction against TLM's use of customer lists sold to AWS?

IV. Did the district court err by concluding TLM owed Juelich and Thoemke additional commission payments for 2009?

V.  Did the district court err by concluding Juelich and Thoemke were not entitled to penalty payments under Minn. Stat. § 181.14?

## ANALYSIS

**I.     The district court did not err by concluding the APA was ambiguous.**

Appellants argue that the district court should not have considered parol evidence in interpreting the APA because the APA unambiguously transferred all receivables on works in progress to AWS. As an initial matter, TLM asserts that this question is not properly before this court because appellants did not raise it in a post-trial motion for a new trial. To preserve a procedural issue for appellate review, a party must raise that issue in a post-trial motion for a new trial. *Sauter v. Wasemiller*, 389 N.W.2d 200, 201 (Minn. 1986). However, motions for a new trial "are not a prerequisite for appellate review of substantive questions of law when a genuine issue of law is properly raised and

6

considered at the district court level." *Alpha Real Estate Co. of Rochester v. Delta Dental Plan of Minn.*, 664 N.W.2d 303, 311 (Minn. 2003). Whether a contract is ambiguous is a question of law that we review de novo. *Dykes v. Sukup Mfg. Co.*, 781 N.W.2d 578, 582 (Minn. 2010). Therefore, the question of the APA's ambiguity is properly before this court.

Parol evidence may be used to interpret a contract only when the contract is ambiguous. *Bari v. Control Data Corp.*, 439 N.W.2d 44, 47 (Minn. App. 1989), *review denied* (Minn. July 12, 1989). The determination of whether a contract is ambiguous "depends on the meaning assigned to the words and phrases in accordance with the apparent purpose of the contract as a whole." *Halla Nursery, Inc. v. City of Chanhassen*, 781 N.W.2d 880, 884 (Minn. 2010). A contract is ambiguous if its language is subject to two or more reasonable interpretations. *Dykes*, 781 N.W.2d at 582.

Appellants argue that the APA cannot be considered ambiguous because it contains a merger clause. But whether a contract is fully integrated is not determined "solely by an inspection of the writing itself." *Bussard v. Coll. of St. Thomas, Inc.*, 294 Minn. 215, 224, 200 N.W.2d 155, 161 (1972). Instead, the writing "must be read in light of the situation of the parties, the subject matter and purposes of the transaction, and like attendant circumstances." *Id*. Even when an agreement purports to be the final and integrated expression of the terms, an ambiguous term may require parol evidence to determine the intent of the parties. *Apple Valley Red-E-Mix, Inc. v. Mills-Winfield Eng'g*

7

*Sales, Inc.*, 436 N.W.2d 121, 123 (Minn. App. 1989), *review denied* (Minn. Apr. 26, 1989).

Among other assets, the APA transferred "Works in Progress" to AWS. Section 1.1.2 of the APA defines "Works in Progress" to mean "'open projects' and 'works in progress' as described in Exhibit [2.5a] and the receivables generated by such Work in Progress divided between Buyer and Seller as described in Exhibit [2.5a]."[2] Exhibit 2.5a lists several projects and states, "Commission will be deducted from gross profit first. All COS [costs of sale] will then be calculated to determine net profit. TLM will receive % of net profit on project." For each project listed, exhibit 2.5a designates a specific "% to TLM," ranging from 20% to 100%.

Here and before the district court, appellants and TLM have interpreted section 1.1.2 and exhibit 2.5a of the APA differently. Appellants interpret the phrase "receivables generated by such Works in Progress divided between Buyer and Seller as described in exhibit [2.5a]" to mean that AWS is entitled to all receivables on works in progress and that the only thing to be "divided between Buyer and Seller" is the net profit on the works in progress, as described in exhibit 2.5a. TLM interprets that phrase as meaning that AWS is entitled to keep only the percentage of net profits not assigned to TLM in exhibit 2.5a. TLM argues that exhibit 2.5a is an incomplete representation of the parties' intention regarding the division of receivables, because it does not discuss the appropriate treatment of the receivables associated with cost of goods. TLM asserts that

---

[2] Section 1.1.2 of the APA mistakenly references "Exhibit 1.1.2." The parties agree that they intended section 1.1.2 to refer to exhibit 2.5a, not exhibit 1.1.2.

8

the parties understood that cost-of-goods payments would be remitted to whichever party had paid those costs, and that TLM would not have continued paying for goods on works in progress after the APA if it did not expect to receive payment for those expenses. Both parties' interpretations of the APA are reasonable.

In holding that the APA is ambiguous as to receivables, the court reasoned that section 1.1.2 contemplates that exhibit 2.5a would state some method of dividing receivables on works in progress, but exhibit 2.5a only discusses the division of *net profits*. The court emphasized that "[r]eceivables include more than net profit . . . because net profit is only part of receivables. . . . [N]et profits are determined after subtracting commissions and other costs of sale from the gross profit."

That the parties interpreted section 1.1.2 and exhibit 2.5a differently lends support to the conclusion that the contract language is subject to more than one reasonable interpretation. Also, the inconsistency of the language between section 1.1.2 and exhibit 2.5a—one referring to "receivables" and the other only dividing "net profits"—further illustrates that the APA is an incomplete and ambiguous representation of the parties' intent regarding the right to receivables on works in progress. Similarly, section 1.1.1 and exhibit 1.1.1, referring to *contracts* acquired by AWS, do not clarify whether or to what extent AWS acquired the *accounts receivable* associated with any acquired contracts. The district court did not err by concluding that the APA is ambiguous as to the intent of the parties regarding the division of receivables on works in progress.

9

**II. The district court did not err by dismissing TLM's conversion claim.**

Because the district court found that the APA did not transfer all accounts receivable on works in progress to AWS, the court concluded that the APA entitled TLM to recover portions of the payments that AWS received on works in progress. TLM requested that the district court amend its order to hold that AWS's wrongful retention of payments was not only a breach of contract but also conversion. The district court declined to do so, reiterating that "the basis for contract and tort liability is the duty or duties that exist between the parties, with tort liability requiring a duty independent from any duty imposed by the contract" and "[h]ere, the relationship between the parties is entirely governed by the APA." TLM argues here that the court erred as a matter of law by concluding that the retention of payments did not constitute conversion. This court reviews de novo the application of law to undisputed facts. *See In re Barg*, 752 N.W.2d 52, 63 (Minn. 2008).

A plaintiff may pursue "two legal remedies for the same wrongful conduct." *Wirig v. Kinney Shoe Corp.*, 461 N.W.2d 374, 379 (Minn. 1990). But ultimately, there is no double recovery: a plaintiff can recover damages only under one legal theory for a single instance of wrongful conduct. *Id.* "[W]hen a plaintiff seeks to recover damages for an alleged breach of contract he is limited to damages flowing only from such breach except in exceptional cases where the defendant's breach of contract constitutes or is accompanied by an independent tort." *Wild v. Rarig*, 302 Minn. 419, 440, 234 N.W.2d 775, 789 (Minn. 1975). An independent tort may accompany a breach of contract when the defendant has a legal duty to the plaintiff arising separately from any duty imposed in

10

the contract. *See id.* at 440-41, 234 N.W.2d at 789-90. "A bad-faith breach of contract does not become a tort." *McNeill & Assocs., Inc. v. ITT Life Ins. Corp.*, 446 N.W.2d 181, 185 (Minn. App. 1986), *review denied* (Minn. Dec. 1, 1989).

Here, the record supports the conclusion that the parties intended the APA to govern their relationship after AWS spun off from TLM. Under the APA, TLM had contractual rights to the payments retained by AWS, because the APA did not transfer all accounts receivable on works in progress to AWS and section 7.2 of the APA instructed the parties to forward any payment that should have been directed to the other party. The gravamen of TLM's claims against AWS was in breach of contract. Because TLM can recover pursuant to its contractual rights against AWS, TLM may not also recover under a theory of conversion.

## III. The district court did not abuse its discretion by lifting the injunction.

The district court's November 2013 order enjoined TLM from "[s]olicit[ing] orders from or sell[ing] to any government customer included in the customer lists generated by the AWS Division before April 1, 2011." The court's justification for this injunction was that the customer lists were sold to AWS as part of the APA and that AWS "would suffer great and irreparable injury" if TLM continued to use those same customer lists to generate its own new sales to government customers.

TLM's post-trial motion requested that the district court either retract the injunction or modify the injunction to merely prevent TLM from selling allied products to customers on the disputed customer lists. TLM argued that AWS did not face any injury from such a modification because there was little overlap between AWS's business

11

selling allied products and TLM's business selling primarily forklifts. Therefore, TLM asserted, the injunction was an unjustified restriction on its business.

In its order on the post-trial motion, the district court found that "the sale of customer lists pursuant to the APA was not intended by the parties to prevent TLM from doing business with customers included on those lists." The district court also found that "[t]he harm TLM experiences from the court's injunction regarding the customer lists is much greater than the harm AWS would face if the court lifted the injunction." Appellants challenge the decision to lift the injunction against TLM marketing to customers on the customer lists.

Whether to grant an injunction is within the discretion of the district court, and this court reviews that decision for abuse of discretion. *Cherne Indus., Inc. v. Grounds & Assoc., Inc.*, 278 N.W.2d 81, 91 (Minn. 1979). "A party seeking an injunction must establish that there is no adequate legal remedy and that an injunction is necessary to prevent great and irreparable injury." *Jackel v. Brower*, 668 N.W.2d 685, 688 (Minn. App. 2003) (quotations omitted), *review denied* (Minn. Nov. 25, 2003).

Although the APA transferred ownership of the customer lists, nothing in the APA purports to prevent TLM from soliciting sales from customers who happen to be on the customer lists. Furthermore, because TLM and AWS primarily sell different products, AWS is not in danger of a great and irreparable injury from TLM marketing to the same customers as AWS. The district court did not abuse its discretion by lifting the injunction.

12

**IV.    The district court did not err by concluding that TLM owed Juelich and Thoemke additional 2009 commission payments.**

In its cross-appeal, TLM raises five arguments why the district court erred by finding that appellants Juelich and Thoemke are entitled to additional commissions for 2009.  Based on the following analysis of TLM's arguments, we agree with the district court that TLM owes additional 2009 commissions.

**A.    Failure to Challenge Nielsen's Statement that TLM Did Not Owe Commissions**

TLM raises three arguments premised upon Juelich and Thoemke's acceptance of—and subsequent failure to challenge—Nielsen's statement in July or August 2010 that they had not earned additional 2009 commissions.  First, TLM invokes the doctrine of account stated, arguing that Juelich and Thoemke assented to Nielsen's statement that they had not earned additional 2009 commissions as an accurate statement of account.  Second, TLM argues that Juelich and Thoemke waived their right to challenge the amount due by accepting and failing to later challenge Nielsen's calculations of the 2009 commissions.  Third, TLM argues that Juelich and Thoemke admitted that the bonuses were not yet earned at the time of the APA.  The APA includes a provision stating that TLM would owe additional 2009 commissions *if* TLM collected additional receivables generated in 2009.  TLM argues that, by accepting this provision, Juelich and Thoemke waived any claim to 2009 commissions other than as a result of the collection of additional 2009 receivables.

13

Waiver is the voluntary relinquishment of a known right, which can be inferred from a party's conduct. *Meagher v. Kavli*, 251 Minn. 477, 486, 88 N.W.2d 871, 878-79 (1958). Similarly, under the doctrine of account stated, if one party renders a statement of account to the other party, and that other party retains the accounting for an unreasonably long time without objecting to it, then the party is deemed to have assented to that accounting. *Am. Druggists Ins. v. Thompson Lumber Co.*, 349 N.W.2d 569, 573 (Minn. App. 1984). For the doctrine of account stated to apply, both parties must have mutually examined each other's claims and reached a mutual agreement as to the correctness of the balance. *Reese Design, Inc. v. I-94 Highway 61 Eastview Ctr. P'ship*, 428 N.W.2d 441, 445 (Minn. App. 1988).

"[W]aiver is ordinarily a question of fact . . . ." *Meagher,* 251 Minn. at 486, 88 N.W.2d at 878. Likewise, whether to apply the doctrine of account stated is a factual question. *Reese Design*, 428 N.W.2d at 444-45. This court reviews the district court's factual findings for clear error. *Rasmussen v. Two Harbors Fish Co.*, 832 N.W.2d 790, 797 (Minn. 2013).

The district court did not clearly err by finding that Juelich and Thoemke did not waive their claims to additional 2009 commissions. As the district court noted, section 2.5 of the APA states, in relevant part, "Seller acknowledges an obligation to pay existing commissions" to Juelich and Thoemke. The court found that section 2.5 reaffirmed Juelich and Thoemke's ongoing right to collect 2009 bonus commissions. Section 2.5

14

belies TLM's assertion that TLM's liability for 2009 commissions was a settled matter as of July 2010.

Additionally, the July 2010 conversation between Nielsen and Juelich does not constitute an account stated. There is no evidence in the record that Juelich had the opportunity to examine any calculations of the 2009 commissions at the time of his conversation with Nielsen. Because the final profit-and-loss statement for fiscal year 2009 was not even completed until November 2010, Nielsen and Juelich could not have mutually examined or agreed upon the calculation of 2009 commissions in July or August 2010.

### B. Exclusion of Income Taxes

TLM also argues that Juelich and Thoemke are not entitled to additional 2009 commission payments because the calculation of commissions should have included income taxes as an overhead expense. The district court's November 2013 order carefully scrutinized TLM's calculations of Juelich and Thoemke's commissions. As a result, the court made several adjustments to these calculations. One of the adjustments was to exclude corporate income taxes from the calculations. Under the court's new calculations, the court found that Juelich and Thoemke were entitled to a 40% commission for 2009. If income taxes had been included in the commission calculation, Juelich and Thoemke would not have met the profitability thresholds that would entitle them to additional commissions.

The provision of the commission agreement referring to the bottom line benchmarks did not specify whether taxes should be included in calculating the "bottom line." Meanwhile, the balance of the commission agreement vacillates between using "pre-tax" and "after-tax" to refer to and discuss "bottom line" and "net profit." Thus, the commission agreement is ambiguous as to whether taxes were included in the "bottom line," for purposes of calculating commissions.

The interpretation of an ambiguous contract provision is a question of fact. *Bari,* 439 N.W.2d at 47. This court reviews findings of fact for clear error. Minn. R. Civ. P. 52.01. A finding is not clearly erroneous if there is reasonable evidence in the record to support the finding. *Rasmussen*, 832 N.W.2d at 797.

The record supports the district court's finding that the parties intended to exclude taxes from the bottom line for the purpose of calculating commissions. The commission agreement compared the net profit of the allied products division to other entities under the header "Net Before Taxes." This comparison showed that the allied products division was by far underperforming in comparison to other TLM divisions and other Toyota dealers. The district court found that the intent of the commission agreement was to bring the allied products division in line with other divisions. According to the "Net Before Taxes" column, requiring the allied products division to achieve a pre-tax bottom line of 2% would achieve that goal. The profit-and-loss statements from 2003 to 2008 also indicate that TLM's practice was to deduct taxes *after* determining a division's

16

profitability. The district court did not clearly err by finding that the parties intended to exclude income tax from the bottom line for the purpose of calculating commissions.

### C.    Statute of Limitations

TLM argues that Juelich and Thoemke's claims for additional 2009 commissions were not timely asserted. Juelich and Thoemke's commission claims are governed by a two-year statute of limitations under Minn. Stat. § 541.07(5) (2014). The statute of limitations on a claim for unpaid commissions runs from the date that commissions are due but not paid. *Levin v. C.O.M.B. Co.*, 441 N.W.2d 801, 803-04 (Minn. 1989). If it is unclear when commissions were due, the due date is a question of fact. *Id.* at 804. This court reviews the district court's findings of fact for clear error. Minn. R. Civ. P. 52.01.

Because the commission agreement did not specify the date when commission payments were due, the district court found that the bonus commissions were due as of the date of the final profit-and-loss statement, November 2010. The record shows that TLM used the calculations in final profit-and-loss statements, rather than preliminary profit-and-loss statements, to calculate the commission payments due to Juelich and Thoemke. The district court did not clearly err by finding that the bonus commissions were due when the final 2009 profit-and-loss statement was complete. Juelich and Thoemke's claims for additional commission payments were timely because they were filed in May and July 2012, within two years of November 2010.

17

**V.  The district court erred by concluding that Juelich and Thoemke were not entitled to penalty payments under Minn. Stat. § 181.14.**

In their complaint, appellants argued that Juelich and Thoemke were entitled not only to additional 2009 commissions, but also penalty payments under Minn. Stat. § 181.14, subd. 2.  Minn. Stat. § 181.14, subd. 1 requires employers to pay all resigning employees any wages or commissions that were earned but unpaid at the time of resignation, no later than the first regularly scheduled payday following the employee's final day of employment, subject to limited exceptions.  Following that period, if such wages and commissions are not paid within 24 hours of the employee's demand for payment, "the employer shall be liable to the employee for a penalty equal to the amount of the employee's average daily earnings" for every day that the payment is late, up to fifteen days.  Minn. Stat. § 181.14, subd. 2.

The district court concluded that TLM owed Juelich and Thoemke additional 2009 commission payments and that Juelich and Thoemke made demands for the commissions in their 2011 letters to TLM.  However, the district court applied Minn. Stat. § 181.14, subd. 3 to preclude Juelich and Thoemke's claims to penalty payments.  This provision states:

> If the employer disputes the amount of wages or commissions claimed by the employee under the provisions of this section or section 181.13, and the employer makes a legal tender of the amount which the employer in good faith claims to be due, the employer shall not be liable for any sum greater than the amount so tendered and interest thereon at the legal rate, unless, in an action brought in a court having jurisdiction, the employee recovers a greater sum than the amount so tendered with interest thereon . . . .

Stated another way, subdivision 3 exempts employers from penalties incurred during an ongoing good-faith dispute over the amount of wages or commissions due, but *only if* the court finds that the employer *does not* owe additional wages or commissions beyond those the employer paid in good faith. However, if the "employee recovers a greater sum than the amount [tendered in good faith] with interest thereon," then the employer remains liable for the penalties imposed in subdivision 2.

The district court found that Juelich and Thoemke had "not recovered a greater amount than the amount originally tendered." The court calculated the amount recovered by subtracting the judgment amount against AWS for breach of contract and unjust enrichment from the additional 2009 commissions that TLM owed to Juelich and Thoemke. Appellants assert that the district court may not credit a judgment owed by AWS against the commissions owed to Juelich and Thoemke for the purposes of determining whether to award penalties under Minn. Stat. § 181.14, subd. 2. More broadly stated, the issue before us is whether the statutory phrase "recovers a greater sum than the amount [] tendered [in good faith]" can incorporate judgment amounts resulting from claims that are unrelated to the disputed wages or commissions.

TLM again argues that this issue is not properly before this court because appellants did not raise it in their post-trial motion. *See Sauter*, 389 N.W.2d at 201 (stating that a post-trial motion raising individual errors allegedly occurring at trial is a prerequisite to appellate review of those errors). But the *Sauter* rule does not apply to "substantive questions of law when a genuine issue of law is properly raised and

considered at the district court level." *Alpha Real Estate*, 664 N.W.2d at 311. Statutory construction is a question of law. *In re Kleven*, 736 N.W.2d 707, 709 (Minn. App. 2007). The district court fully considered how Minn. Stat. § 181.14, subd. 3 applied to appellants' facts, so this issue is properly before this court.

The application of a statute to undisputed facts is reviewed de novo. *In re Barg*, 752 N.W.2d at 63. "[T]he goal of all statutory interpretation is to ascertain and effectuate the intention of the legislature. The first step in statutory interpretation is to determine whether the statute's language, on its face, is ambiguous." *Christianson v. Henke*, 831 N.W.2d 532, 536 (Minn. 2013) (internal quotations and citations omitted). The statute's language is ambiguous if the plain and ordinary meaning of a word or phrase is subject to more than one reasonable interpretation. *Id.*

Minn. Stat. § 181.14 does not define the phrase at issue or explain how to calculate the sum recovered. The plain meaning of the phrase does not clarify the application of subdivision 3 to this appeal. Within the context of a lawsuit, the plain meaning of "recover" is to obtain by a judgment, to obtain a judgment in one's favor, to obtain damages or other relief, or to succeed in a lawsuit or other legal proceeding. *Black's Law Dictionary* 1389 (9th ed. 2009). This definition does not clarify whether the sum recovered, for the purposes of Minn. Stat. § 181.14, subd. 3, refers only to the judgment amount related to the unpaid wages or commissions, or if the calculation can also include amounts owed on claims unrelated to unpaid wages or commissions. Nor have any Minnesota cases clarified this interpretive issue. In *O'Kronglis v. Broberg*, this court

20

applied Minn. Stat. § 181.14, subd. 3 and used the word "recovers" to refer to the additional wages to which an employee is entitled in a dispute over unpaid wages. 456 N.W.2d 468, 470 (Minn. App. 1990). However, *O'Kronglis* did not involve judgments on claims unrelated to unpaid commissions. The statute is ambiguous as to whether the calculation of the sum recovered can include amounts recovered or owed on claims unrelated to unpaid wages or commissions.

If language in a statute is ambiguous, this court "consider[s] the statute's language in the context of the legislative intent of the statute and the factors set forth under Minn. Stat. § 645.16." *Christianson*, 831 N.W.2d at 537. Those factors are:

> (1)  the occasion and necessity for the law;
> (2)  the circumstances under which it was enacted;
> (3)  the mischief to be remedied;
> (4)  the object to be attained;
> (5)  the former law, if any, including other laws upon the same or similar subjects;
> (6)  the consequences of a particular interpretation;
> (7)  the contemporaneous legislative history; and
> (8)  legislative and administrative interpretations of the statute.

Minn. Stat. § 645.16 (2014).

Minn. Stat. § 181.14 is part of the Payment of Wages Act, the purpose of which is "to penalize employers that fail to promptly pay their employees' wages." *Caldas v. Affordable Granite & Stone, Inc.*, 820 N.W.2d 826, 836 (Minn. 2012). Minn. Stat. § 181.14 specifically protects resigning employees from having their employers withhold wages and commissions that they have earned but were not yet paid at the time of resignation. Subdivision 2 provides an extra measure of protection for employees by

21

penalizing employers who do not comply with subdivision 1. Subdivision 3 provides a narrow exception to protect employers whose non-compliance with subdivision 1 was the result of an ongoing good-faith dispute over the amount of wages or commissions due. This exception only applies where the court confirms that the employee's claim was meritless by finding that the employee is not due more wages or commissions than the employer already paid in good faith.

To allow an employer to offset unrelated judgment amounts in its favor against wages and commissions owed would undermine the protective and punitive purposes of Minn. Stat. § 181.14, subds. 1-2. That interpretation would allow employers to use unrelated judgments to avoid paying the penalty for late payment of wages. It would also greatly expand the exception in subdivision 3, rendering the exception applicable whenever a lawsuit under Minn. Stat. § 181.14, subd. 1 includes other claims and judgments against the employee.

Based on the legislative intent of Minn. Stat. § 181.14, subds. 1-3, we conclude that the phrase "recovers a greater sum" refers only to the total amount of wages and commissions that the court determines that the employer should have paid to the employee. To calculate whether the employee "recovers a greater sum than the amount []  tendered [in good faith]," within the meaning of Minn. Stat. § 181.14, subd. 3, a court should compare only (1) the amount the employer tendered in good faith, and (2) the amount of wages and commissions the court found that an employee was actually due pursuant to a claim under Minn. Stat. § 181.14, subd. 1. If the amount due is greater than

22

the amount tendered, then the employer remains liable for penalties under Minn. Stat. § 181.14, subd. 2.

## D E C I S I O N

We conclude that the district court should have awarded Juelich and Thoemke penalties under Minn. Stat. § 181.14, subd. 2. TLM paid Juelich and Thoemke commissions for 2009 at the 30% rate, and did not tender any additional commissions after Juelich and Thoemke demanded payment. The district court concluded that TLM should have paid them commissions at the 40% rate. Therefore, Juelich and Thoemke recovered a greater sum than the amount of commissions that TLM tendered, and Minn. Stat. § 181.14, subd. 3 did not excuse TLM from owing penalties. Because more than 15 days passed after Juelich and Thoemke demanded payment of the additional 2009 commissions, TLM owes the maximum 15-day penalty upon the commissions. We remand for the district court to determine the proper amount of penalties that TLM owes under Minn. Stat. § 181.14, subd. 2.

**Affirmed in part, reversed in part, and remanded.**